## SOUTHERN PAC. CO. v. BARTINE et al.

### (Circuit Court, D. Nevada. March 3, 1909.)

**1. STATUTES (§ 153*)—SUBJECTS AND TITLES OF ACTS—REPEALING PROVISIONS.**

Const. Nev. art. 4, § 17, which provides that "each law enacted by the Legislature shall embrace but one subject and matters properly connected therewith which subject shall be briefly expressed in the title," applies to the subject and not to the effect of a law, and if the necessary effect of a statute is to repeal previous legislation on the same subject it does no violence to such provision by failing to specifically express such repeal in its title, nor is it necessary that a general provision expressly repealing prior inconsistent legislation on the same subject should be mentioned in the title.

[Ed. Note.—For other cases, see Statutes, Dec. Dig. § 153.*]

**2. STATUTES (§ 64*)—EFFECT OF PARTIAL INVALIDITY.**

The inclusion in a statute of a section foreign to the subject of the act and not mentioned in its title does not invalidate the remainder of the act, although it may itself be void.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 195; Dec. Dig. § 64.*]

**3. STATUTES (§ 141*)—"AMENDATORY ACTS"—CONSTITUTIONAL PROVISIONS.**

The provision of Const. Nev. art. 4, § 17, that "no law shall be revised or amended by reference to its title only, but in such cases the act as revised or section as amended shall be re-enacted and published at length," does not apply to a new act which is complete in itself and which does not purport to be amendatory of any previous act and does not require a reference to any other law to discover its scope or meaning. Such an act is not amendatory within the meaning of the provision, although in general terms it repeals all acts and parts of acts inconsistent with its provisions.

[Ed. Note.—For other cases, see Statutes, Dec. Dig. § 141.*]

**4. STATUTES (§ 141*)—AMENDATORY ACTS—NATURE.**

Act Nev. March 5, 1907 (St. Nev. 1907, p. 73, c. 44), entitled "An act to regulate railroads," etc., is not amendatory, but is a complete act covering the entire subject, which is not unconstitutional because it does not re-enact or publish at length former statutes, but which supersedes and by implication repeals all former legislation on the subject.

[Ed. Note.—For other cases, see Statutes, Dec. Dig. § 141.*]

**5. CONSTITUTIONAL LAW (§ 242*)—EQUAL PROTECTION OF LAWS—REGULATION OF RAILROAD CHARGES.**

The provision of such act that the maximum rates therein fixed shall not apply to any railroad until such road shall have been constructed and in operation for two years between the points where it shall commence to deliver freights does not render it unconstitutional as making a classifica-

---

tion which denies to some roads the equal protection of the laws, such classification being reasonable and not arbitrary and within the power of the Legislature.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 242.*]

6. STATUTES (§ 76*)—GENERAL LAWS—UNIFORMITY OF OPERATION.

The provisions of such act classifying railroads for rate-fixing purposes by excepting from the rates fixed therein newly built roads, permitting higher rates to be charged by narrow-gauge roads, and authorizing the state railroad commission to alter rates with respect to particular roads when deemed just, do not violate Const. Nev. art. 4, § 21, providing that "where a general law can be made applicable all laws shall be general and of uniform operation throughout the state."

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 77½–78½; Dec. Dig. § 76.*]

7. CONSTITUTIONAL LAW (§ 58*) — DISTRIBUTION OF GOVERNMENTAL POWERS — ENCROACHMENT ON EXECUTIVE.

The provision of Act Nev. March 5, 1907 (St. Nev. 1907, p. 73, c. 44), that the Governor, Lieutenant Governor, and Attorney General of the state shall constitute a railroad board for the purpose of appointing the members of a railroad commission thereby created, is not the appointment of such state officers to a new office and a violation of the state Constitution as the exercise of an executive function, but merely imposes new duties on such officers, and is a valid exercise of legislative power, especially in view of the fact that the Constitution nowhere vests the Governor with sole appointive power, but merely provides that he shall be the "chief executive," and also provides in article 15, § 10, that "all officers whose election or appointment is not otherwise provided for shall be chosen or appointed as may be prescribed by law."

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 88; Dec. Dig. § 58.*]

8. CARRIERS (§ 12*)—REGULATION OF CHARGES—POWERS.

A state has power, either through its Legislature or a commission, to regulate the rates of charge of common carriers on intrastate business, subject to the limitation that such rates must be reasonable and afford to the carrier just and reasonable compensation for the services performed and for the use of the property devoted to the business, estimated at its fair valuation.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 11; Dec. Dig. § 12.*]

9. CARRIERS (§ 12*)—STATUTES REGULATING CHARGES—EVIDENCE OF REASONABLENESS.

In estimating the value of the property of a railroad company for the purpose of determining the reasonableness of rates fixed by a state, neither the market value of its stocks and bonds, the cost of construction, nor the cost of reproduction of the property is absolutely controlling, but each should be regarded as a fact tending to show fair value, and, if one only of such facts is shown, it may be assumed that it represents such value.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.*]

10. EVIDENCE (§ 508*) — OPINIONS — EXPERTS—FREIGHT RATES—REASONABLENESS.

In determining the reasonableness of freight rates fixed by a state on intrastate business, as applied to a railroad doing both intrastate and interstate business, it must be recognized that the cost of handling local shipments is relatively greater than through shipments, and, it being impossible to determine the exact ratio of difference, the opinions of experts based upon the facts of each particular case are admissible on the question.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 508.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**11. COURTS (§ 329\*)—JURISDICTION OF FEDERAL COURTS—AMOUNT IN DISPUTE.**

In a suit for an injunction in a federal court the amount in dispute for jurisdictional purposes is the value of the right to be protected, and where the requisite value is alleged and not denied it is immaterial how much, or whether any, actual loss has been sustained.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 329.\*

Jurisdiction of Circuit Courts as determined by the amount in controversy, see notes to Auer v. Lombard, 19 C. C. A. 75; Tennent–Stribling Shoe Co. v. Roper, 36 C. C. A. 459.]

**12. CARRIERS (§ 12\*) — STATUTES REGULATING RATES —- REASONABLENESS OF RATES.**

It does not necessarily follow that a schedule of maximum freight rates is confiscatory and unconstitutional because it fails to yield to a railroad company a reasonable return on the investment. Such rates must be reasonable not only to the company but also to the public, and the fact that they do not prove remunerative to a new road built through a sparsely settled country where there is at present little local business does not require the few people and the small business to pay such rates as will make the road immediately profitable to its stockholders.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.\*]

**13. CARRIERS (§ 12\*) — STATUTE REGULATING RATES — REASONABLENESS OF RATES.**

In suits by various railroad companies to enjoin the enforcement of Act Nev. March 5, 1907 (St. Nev. 1907, p. 73, c. 44), creating a Railroad Commission and authorizing it to establish freight rates on intrastate business, not higher than those prescribed in a schedule of maximum rates therein contained, evidence considered, and, except in the case of one complainant, *held* insufficient to show that such maximum rates, if adopted and enforced, would be unconstitutional as confiscatory.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.\*]

**14. CONSTITUTIONAL LAW (§ 52\*) —- LEGISLATIVE POWERS — FIXING RAILROAD RATES.**

The fixing of railroad rates by a state through whatever body, and although preceded by an investigation judicial in form, is a legislative and not a judicial act, and a statute authorizing the fixing of rates by a Railroad Commission is not invalid as an attempt to confer judicial power on the commission in violation of a provision of the state Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 52.\*]

**15. CONSTITUTIONAL LAW (§ 242\*)—EQUAL PROTECTION OF LAWS—REGULATION OF RAILROAD RATES.**

Act Nev. March 5, 1907 (St. Nev. 1907, p. 73, c. 44), creating a Railroad Commission. and authorizing it, after investigation and on a finding that rates charged by any railroad company are unreasonable or unjustly discriminatory, to fix just and reasonable rates to be charged by such company, is not unconstitutional as denying to some railroad companies the equal protection of the laws because the rates so prescribed may not be the same as to all companies.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 242.\*]

**16. CARRIERS (§ 18\*)—SUBJECTS OF RELIEF.**

Act Nev. March 5, 1907 (St. Nev. 1907, p. 73, c. 44), provides for the appointment of a Railroad Commission, and authorizes such commission, if, after an investigation, it shall determine that the freight rates charged by any railroad on intrastate business are unreasonable or unjustly discriminatory. to fix just and reasonable rates to be charged by such road not exceeding those prescribed in a schedule contained in the act. It also provides for proceedings by the Attorney General on request of the commission to enforce its orders, and their review by the courts at suit of the railroad companies. *Held*, that a suit will not lie in a federal court

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to enjoin the exercise by the board of its legislative power to fix rates, but that such court could only review rates, after they had been finally fixed, as to their constitutionality and validity.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

In Equity. With this case has been consolidated in this court the cases of the Nevada & California Railway Company, the San Pedro, Los Angeles & Salt Lake Railroad Company, the Eureka & Palisade Railway Company, the Tonopah & Goldfield Railroad Company, and the Virginia & Truckee Railway against the same defendants.

March 22, 1865 (St. 1865, p. 427, c. 146), the Legislature of the state of Nevada passed an act entitled "An act to provide for the incorporation of railroad companies, and the management of the affairs thereof, and other matters relating thereto." The first 16 sections of the act deal with the formation and organization of railroad companies and the powers, rights, and duties of directors and stockholders. Sections 17 to 39 deal with the corporate powers, including the right of eminent domain and the attendant procedure. The corporations are expressly empowered in section 17 "to regulate the time and manner in which passengers and property shall be transported, and the tolls and compensation to be paid therefor, within the limits prescribed by law." The consolidation of railroad companies is authorized by section 40. Sections 43 and 44 provide for certain filings with the Secretary of State and for the making of reports. Sections 40 to 50 go into the details of regulation, providing for fences, and for liability for stock injured or killed, requiring the ringing of a bell under penalty, prescribing requirements as to passengers, and the receipt and checking of their baggage, and, in respect to the running of trains, their time, their accommodations, and fixing upon the company the obligation to receive, transport, and discharge passengers and property at, from and to points on their line on payment of fares or freight; also providing for the payment of damages in case of failure to receive and transport property at the appointed times and places, and relieving the corporation from liability to passengers injured in violation of the printed regulations of the company, posted in a conspicuous place; and giving conductors authority to eject passengers who refuse to pay fare. Section 50 requires certain trainmen to wear a particular kind of badge. Section 51 prescribes the maximum rates and charges for passenger and freight traffic, including the specification of a minimum for any freight shipment for any distance. The section is in terms as follows:

"It shall be unlawful for any such railroad company to charge more than ten cents per mile for each passenger, and twenty cents per mile for each ton of freight transported on its road; and for every transgression of such limitation the company shall be liable to the party suffering thereby treble the entire amount of the fare or freight so charged to such party; provided, that in no case shall the company be required to receive less than thirty-five cents for any one lot of freight for any distance."

Section 52 provides a penalty for intoxication of certain employés, and sections 53 to 57 provide for the completion of the road within a certain time, require the use of a certain class of iron for tracks, and fix penalties in respect to the properties of the corporations, and the operation and management of the same. Section 58 extends the act to certain street railways.

The original act contained no clause repealing conflicting statutes, but in 1871, by way of amendment to section 57 of this act, two subsequently adopted amendatory acts, one approved March 9, 1866 (St. 1866, p. 251, c. 109), and the other February 16, 1869 (St. 1869, p. 65, c. 23), were repealed. St. Nev. 1871, p. 65, c. 21.

In 1879 (St. Nev. 1879, p. 28, c. 19) another act was passed by the Legislature of the state of Nevada, entitled "An act to prevent discrimination in fares and freights by railroad companies whose railroads run through the state of Nevada, or by railroad companies, the terminus or termini of whose railroads are within the state of Nevada." This act prohibits discrimination

either in charges or services. It also prohibits rebates, drawbacks, combinations to prevent continuous carriage, and charging more per car load or part thereof, of similar property, per mile for a shorter than for a longer distance in one continuous carriage. The act requires carriers to adopt and post schedules of freight rates, which shall remain in full force until another schedule has been substituted and posted, for at least five days, and it was made unlawful "to charge or receive more or less compensation for the carriage, receiving, delivery, loading, unloading, handling" of property "than shall be specified in such schedule as may at the time be in force." By section 6, the provisions of this act were made to apply to all property, and the receiving, delivery, loading, unloading, handling, storing, or carriage of the same on one actually or substantially continuous carriage, and whether carried on one railroad or partly on several railroads. And it was expressly provided by said section that each and every railroad company, as aforesaid, shall fix its own rate or rates of its schedule, and such rate or rates of the schedule so fixed shall not govern or affect the rate or rates of any other railroad company; and provided, further, that such rate or rates in such schedules so fixed shall not exceed the rate or rates now allowed to be charged by law. Sections 7 and 8 provide that every person, company, corporation, or officer, receiver, trustee, lessee, or agent of any company or person engaged in transporting property by railroad in Nevada who violates any provision of the act shall forfeit and pay to the person injured thereby a sum equal to three times the damage suffered, and shall also forfeit and pay a penalty of not less than $2,000. The act does not refer to any previous act, nor does it contain any repealing clause whatever.

March 5, 1907, the Legislature of the state of Nevada passed an act entitled: "An act to regulate railroads, telegraph and telephone companies and other common carriers in this state, creating a Railroad Commission, constituting the Governor, the Lieutenant Governor, and the Attorney General a railroad board for the appointment and removal of the Railroad Commissioners, prevent the imposition of unreasonable rates, prevent unjust discrimination, insure an adequate railway service, and fixing maximum freight charges." St. Nev. 1907, p. 73, c. 44.

The act, in so far as it is material to this proceeding, is as follows:

"Section 1. A Railroad Commission is hereby created, to be composed of three commissioners. The Governor, the Lieutenant-Governor, and the Attorney-General shall constitute a railroad board for the purpose of appointing such commissioners. A majority of the members of said railroad board may perform all the duties required of such board. Within thirty days after the passage of this act the railroad board shall appoint such commissioners and designate the term of each, and they shall hold until their successors are appointed. The term of one such appointee shall terminate on the first Monday in February, 1909; the term of the second such appointee shall terminate on the first Monday in February, 1910; and the term of the third such appointee shall terminate on the first Monday in February, 1911. On the second Monday in January, 1909, and annually thereafter, there shall be appointed in the same manner, one commissioner for the term of three years from the first Monday in February of such year. Each commissioner so appointed shall hold office until his successor is appointed and qualified. Any vacancy shall be filled by appointment by the railroad board."

Subdivision "a" prescribes the qualifications of the commissioners. "b" provides that commissioners, for inefficiency, neglect of duty, or malfeasance, may be removed by the railroad board. "c" provides that the commissioners shall have no pecuniary railroad interests. "d" provides that:

"Whenever a complaint is made to the commission of a violation of any of the provisions of this act, or of any order of the commission, it shall, within four months, commence an investigation of said charge and shall determine the same within six months, unless the person preferring said charges shall agree in writing to a longer time. A failure to comply with this provision shall ipso facto render the office of each of the commissioners vacant, and the railroad board shall appoint new commissioners as provided for by this act."

Subdivision "e" provides that one commissioner must devote his entire time to the duties of the office; "f" that commissioners must take the official oath;

"g" provides a salary of $5,000 per annum for the commissioner who devotes his entire time, and $2,500 for each of the others. "h," "i," and "j" provide for the meeting and organization of the commission, the election of a chairman, and the appointment, salary, qualification, and duties of the secretary. "k" provides that the commissioners shall be known collectively as "Railroad Commission of Nevada," and in that name may sue and be sued, and it shall have an official seal by which it shall authenticate its proceedings. "l" requires the commission to keep its office at Carson, though it may hold sessions at other places.

"(m) The commission shall have the power to adopt and publish rules to govern its proceedings, and to regulate the mode and manner of all investigations and hearings of railroads and other parties before it, and all hearings shall be open to the public."

The commission is authorized to confer by correspondence, or by attending conventions, with the railroad commissioners of other states, and with the Interstate Commerce Commission.

Section 2 defines the term "railroad," and extends the provisions and penalties of the act so far as applicable, and the supervision and control of the commission to express companies, telegraph and telephone companies.

Section 3 requires every railroad to furnish adequate facilities; charges must be reasonable, and every unjust and unreasonable charge is unlawful.

Section 4 requires every railroad to file with the commission schedules of all fares and freights, and copies of all rules and regulations which in any manner affect the rates, also its charges for delay in unloading cars, and for any other service in connection with the transportation of persons or property. Subdivisions "a," "b," "c," and "d" provide that no change shall be made in the schedule except upon 30 days' notice. The commission may dispense with the 30 days notice and reduce it to three. Notice of change of rates must be posted, and the posted schedule must be adhered to; the commission may prescribe changes in the form in which the schedules are issued, and such form is designed by the statute to conform approximately to the forms prescribed by the Interstate Commerce Commission.

Section 5 provides that joint rates must be reasonable. A joint rate may be less than the combination of locals.

Section 6 permits concentration, commodity, transit, and other special contract rates, but such rates must be open to all shippers of a like kind of traffic under similar circumstances and conditions; such rates shall be under the supervision of the commission.

"Sec. 7. The classification of freight, commonly known as the 'Western Classification, No. 41,' issued by the Western Classification Committee, and taking effect October 1, 1906, and adopted by the Oregon Short Line Railroad Company, the Southern Pacific Company, Pacific System, San Pedro, Los Angeles and Salt Lake Railroad, and other roads, shall be adopted by the commission as the classification of freight, and shall be uniform upon all railroads in this state.

"(a) The commission shall not fix a greater rate, nor shall it allow any broad or standard-gauge road to charge a greater rate than that fixed for the following classifications:

"Class 1—Eight cents a ton a mile.

"Class 2—Seven and four-tenths cents a ton a mile.

"Class 3—Six and four-tenths cents a ton a mile.

"Class 4—Five and two-tenths cents a ton a mile.

"Class 5—Four and six-tenths cents a ton a mile.

"Class A—Four and six-tenths cents a ton a mile.

"Class B—Three and six-tenths cents a ton a mile.

"Class C—Three and one-tenth cents a ton a mile.

"Class D—Two and seven-tenths cents a ton a mile.

"Class E—Two and seven-tenths cents a ton a mile.

"(b) All other property classed higher than class one, and known as class one and one-half times first class; double first class; three times first class; and four times first class, shall not exceed twenty cents a ton a mile.

"(c) The commission shall not fix a greater rate nor shall it allow any broad or standard-gauge road to charge a greater rate for the following classes or grades of ore than that fixed herein:

"Rough stone of all kinds, iron ore, limestone, or other ore, stone or mineral, commonly used as fluxes, one-half cent a ton a mile.

"Ores not exceeding $20 a ton in value, one cent a ton a mile.

"Ores not exceeding $30 a ton in value, one and one-tenth of a cent a ton a mile.

"Ores not exceeding $40 a ton in value, one and one-fourth cents a ton a mile.

"Ores not exceeding $50 a ton in value, one and thirty-five hundredths cents a ton a mile.

"Ores not exceeding $60 a ton in value, one and one-half cents a ton a mile.

"Ores not exceeding $70 a ton in value, one and three-fourths cents a ton a mile.

"Ores not exceeding $80 a ton in value, one and nine-tenths cents a ton a mile.

"Ores not exceeding $100 a ton in value, two cents a ton a mile.

"All other ores shall not be charged at a greater rate than two cents a ton a mile.

"(d) Nothing contained herein shall be construed as preventing the commission fixing a less rate than those mentioned nor prevent it from fixing rates upon all articles not mentioned in the classification adopted herein on articles usually classed as special commodities.

"(e) All narrow-gauge railroads may be permitted by the commission to charge a rate not to exceed one hundred and fifty per cent higher than those mentioned for broad-gauge railroads.

"(f) Provided, that the maximum rates herein fixed shall not apply to any railroad until the said road shall have been constructed and in operation for two years between the points where they shall commence to deliver freights; provided further, that all hauls of less than fifty miles may be charged as if actually hauled fifty miles, but where the haul is fifteen miles, or less, then the commission shall fix such rates as it may deem fair and just."

Section 8 provides that in certain cases passengers or freight may be transported free, or at reduced rates.

Section 9 requires adequate depots, buildings, switches and side tracks.

Section 10 requires railroads to furnish suitable cars, and in case of car shortage to make an equitable distribution of car supply, preference being given to shipments of live stock and perishable property.

"(a) The commission shall have the power to enforce reasonable regulations for furnishing cars to shippers, and switching the same, and for the loading and unloading thereof, and the weighing of the cars and freight offered for shipment over any line of railroad."

Section 11 requires railroads to furnish proper facilities as between themselves for the interchange of traffic.

"Sec. 12. Upon complaint of any firm, person, corporation or association, or of any mercantile, agricultural or manufacturing society, or of any body politic or municipal organization, that any of the rates, charges or classifications, or any joint rate or rates are in any respect unreasonable or unjustly discriminatory, or that any regulation or practice whatsoever affecting the transportation of persons or property, or any service in connection therewith, are in any respect unreasonable or unjustly discriminatory, or that any service is inadequate, the commission may notify the railroad complained of that complaint has been made, and ten days after such notice has been given the commission may proceed to investigate the same as hereinafter provided, but before proceeding to make such investigation the commission shall give the railroad and the complainants ten days' notice of the time and place when and where such matters will be considered and determined, and said parties shall be entitled to be heard and shall have process to enforce the attendance of witnesses. If upon such investigation the rate or rates, or any regulation, practice or service complained of shall be found to be unreasonable or unjustly discriminatory, or the service shall be found to be inadequate, the commission shall have power to fix and order substituted therefor such rate or rates, fares, charges or classifications, as it shall have determined to be just and reasonable and which shall be charged, imposed and followed in the future, and shall also have power to make such orders respecting such regu-

lation, practice or service, as it shall have determined to be reasonable and which shall be observed and followed in the future."

Subdivision "a" provides for separate hearings on each rate complained of.

"(b) Whenever the commission shall believe that any rate or rates or charge or charges may be unreasonable or unjustly discriminatory, and that investigation relating thereto should be made, it may, upon its own motion, investigate the same. Before making such investigation it shall present to the railroad a statement in writing, setting forth the rate or charge to be investigated. Thereafter, on ten days' notice to the railroad of the time and place of such investigation, the commission may proceed to investigate such rate or charge in the same manner and make like orders in respect thereto as if such investigation had been made upon complaint."

"c" permits any railroad to make complaint.

Section 13 empowers each commissioner to administer oaths, to certify to official acts, to issue subpœnas, and to compel the attendance of witnesses and the production of documents and testimony, and makes it the duty of the district court of any county thereof to compel obedience to the orders of the commission. Subdivision "a" provides for fees and mileage of witnesses. "b" provides for taking depositions. "c" provides that complete records of all proceedings before the commission shall be kept.

"Sec. 14. Whenever, upon an investigation made under the provisions of this act, the commissioner shall find any existing rate or rates, fares, charges or classification, or any joint rate or rates or any regulation or practice whatsoever affecting the transportation of persons or property, or any service in connection therewith, are unreasonable or unjustly discriminatory, or any service is inadequate, it shall determine and by order fix a reasonable rate, fare, charge, classification or a joint rate to be imposed, observed and followed in future, in lieu of that found to be unreasonable or unjustly discriminatory, and it shall determine and by order fix a reasonable regulation, practice or service to be imposed, observed and followed in the future, in lieu of that found to be unreasonable or unjustly discriminatory or inadequate, as the case may be, and it shall cause a certified copy of each such order to be delivered to an officer or station agent of the railroad affected thereby, which order shall of its own force take effect and become operative thirty days after the service thereof. All railroads to which the order applies shall make such changes on their schedule on file as may be necessary to make the same conform to said order, and no change shall thereafter be made by any railroad in any such rates, fares, or charges, or in any joint rate or rates, without the approval of the commission. Certified copies of all other orders of the commission shall be delivered to the railroads affected thereby in like manner, and the same shall take effect within such time thereafter as the commission shall prescribe."

Subdivision "a" provides for the rescission or alteration by the commission of its own orders.

"Sec. 15. All rates, fares, charges, classifications and joint rates fixed by the commission shall be in force, and shall be prima facie lawful, for a period of one year from the date the same takes effect, and until changed or modified by the commission, or in pursuance of section 16 of this act. All regulations, practices and service prescribed by the commission shall be in force and shall be prima facie reasonable, unless suspended or found otherwise in an action brought for that purpose, pursuant to the provisions of section 16 of this act, or until changed or modified by the commission as provided for in paragraph "a," section 14, of this act.

"Sec. 16. Any railroad or other party in interest being dissatisfied with any order of the commission fixing any rate or rates, fares, charges, classifications, joint rate or rates, or any order fixing any regulations, practices or services, may, within ninety (90) days, commence an action in the district court of the proper county, against the commission as defendant to vacate and set aside any such order on the ground that the rate or rates, fares, charges, classifications, joint rate or rates, fixed in such order is unlawful or unreasonable, or that any such regulation, practice or service, fixed in such order is unreasonable, in which action the adverse parties shall be served with a summons and copy of the complaint. The commission shall file its answer, and on leave of

court, any interested party may file the answer to said complaint within thirty (30) days, after the service thereof, whereupon said action shall be at issue and stand ready for trial upon twenty (20) days' notice by either party. All actions brought under this section shall have precedence over any civil cause of a different nature pending in such court, and the court shall always be deemed open for the trial thereof, and the same shall be tried and determined as other civil actions; any party to such action may introduce original evidence in addition to the transcript of the evidence offered to said commission.

"(a) No injunction shall issue suspending or staying any order of the commission except upon application to the court or judge thereof, notice to the commission having been first given and hearing having been had thereon; provided, that all rates fixed by the commission shall be deemed reasonable and just, and shall remain in full force and effect until final determination by the courts, upon appeal.

"(b) If, upon the trial of such action, evidence shall be introduced by the plaintiff which is found by the court to be different from that offered upon the hearing before the commission, or additional thereto, the court before proceeding to render judgment, unless the parties to such action stipulate in writing to the contrary, shall transmit a copy of such evidence to the commission, and shall stay further proceedings in said action for fifteen (15) days from the date of such transmission. Upon receipt of such evidence the commission shall consider the same, and may alter, modify, amend or rescind its order relating to such rate or rates, fares, charges, classifications, joint rate or rates, regulation, practice or service complained of in said action, and shall report its action thereon to said court within ten days from the receipt of such evidence.

"(c) If the commission shall rescind its order complained of, the action shall be dismissed; if it shall alter, modify or amend the same, such altered, modified or amended order shall take the place of the original order complained of, and judgment shall be rendered thereon, as though made by the commission in the first instance. If the original order shall not be rescinded or changed by the commission, judgment shall be rendered upon such original order.

"(d) Either party to said action within sixty (60) days after service of a copy of the order or judgment of the court may appeal or take the case up on error as in other civil actions. Where an appeal is taken the cause shall, on the return of the papers to the higher court, be immediately placed on the calendar of the then pending term, and shall be assigned and brought to a hearing in the same manner as other causes on the calendar.

"(e) In all actions under this section the burden of proof shall be upon the plaintiff to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable, as the case may be."

Section 17 provides that the practice in court proceedings shall be the same as the practice in civil proceedings, and empowers the sheriff to execute any process under this act. Subdivision "a" provides that no person shall be excused from testifying because his testimony may tend to incriminate him. "b" makes certified copies of orders by the commission prima facie evidence.

Section 18 authorizes the commission to inquire into the management of the business of all railroads, to require written statements from railroads, inspect the books and papers of any railroad, to examine under oath any officer, agent, or employé of such railroad in relation to any matter which is the subject of complaint and investigation, and to require by order or subpœna the production of any books, papers, or accounts relating to such subject.

"Any railroad failing or refusing to comply with any such order or subpœna within a reasonable time shall, for each day it shall so fail or refuse, forfeit and pay into the state treasury a sum of not less than one hundred dollars nor more than one thousand dollars, to be recovered in a civil action brought in the name of the Railroad Commission of Nevada."

Section 19 provides that every railroad when so required by the commission shall submit copies of all its contracts relating to transportation of persons and property, and annually shall file with the commission a list of all railroad tickets and passes and mileage books issued for other than actual bona fide money consideration at full rates.

Section 20 requires each railroad to file annually with the commission a full report of its business.

"Sec. 21. The commission shall have power, and on complaint of any person it is hereby made its duty, to investigate all or any freight rates on interstate traffic on railroads in this state, and when the same are, in the opinion of the commission, excessive or discriminatory, or are levied or laid in violation of the interstate commerce law, or in conflict with the rulings, orders or regulations of the Interstate Commerce Commission, the commission shall present the facts to the railroad, with a request to make such changes as the commission may advise, and if such changes are not made within a reasonable time, the commission shall apply by petition to the Interstate Commerce Commission for relief. All freight tariffs issued by any such railroad relating to interstate traffic in this state shall be filed in the office of the commission within thirty days after the passage of this act, and all such tariffs thereafter issued shall be filed with the commission when issued."

Section 22 defines unjust discrimination, and declares that any railroad guilty thereof shall forfeit and pay into the state treasury not less than $100 nor more than $5,000 for such offense, "and any agent or officer so offending shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than fifty dollars nor more than one thousand dollars for each offense."

Section 23 provides that it shall be unlawful for any common carrier, subject to the provisions of the act, to give any undue or unreasonable preference or advantage.

Section 24 provides that it shall be unlawful for any person, firm, or corporation knowingly to receive any rebate, concession, or discrimination.

"Any person, firm or corporation violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than fifty dollars nor more than one thousand dollars for each offense."

Section 25 prohibits the giving of passes to state, district, county, or municipal officers of this state, and provides the penalties therefor.

"Sec. 26. If any railroad shall do or cause to be done or permit to be done any matter, act or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter or thing required to be done by it, such railroad shall be liable to the person, firm or corporation injured thereby in treble the amount of damages sustained in consequence of such violation; provided, that any recovery as in this section provided shall in no manner affect the recovery by the state of the penalty prescribed for such violation.

"Sec. 27. Any officer, agent or employee of any railroad who shall wilfully fail or refuse to fill out and return any blanks as required by this act, or shall wilfully fail or refuse to answer any questions therein propounded, or shall knowingly or wilfully give a false answer to any such questions, or shall evade the answer to any such questions, where the fact inquired of is within his knowledge, or who shall, upon proper demand, wilfully fail or refuse to exhibit to any commissioner or any commissioners, or any person authorized to examine the same, any book, paper or account of such railroad, which is in his possession or under his control, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than one hundred dollars nor more than one thousand dollars for each such offense, and a penalty of not less than five hundred dollars nor more than one thousand dollars shall be recovered from the railroad for each such offense when such officer, agent, or employee acted in obedience to the direction, instructions or request of such railroad or any general officer thereof.

"Sec. 28. If any railroad shall violate any provision of this act, or shall do any act herein prohibited, or shall fail, or refuse to perform any duty enjoined upon it, or upon failure of any railroad to place in operation any rate or joint rate, or do any other act herein prohibited, for which a penalty has not been provided, or shall fail, neglect or refuse to obey any lawful requirement or order made by the commission or any court (upon its application), for every such violation, failure or refusal, such railroad or railroads shall forfeit and pay into the state treasury a sum of not less than one hundred dollars nor more than ten thousand dollars for each offense. In construing and enforcing the provisions of this section, the act, omission or failure of any officer, agent, or other person acting for or employed by any

railroad, acting within the scope of his employment shall in every case be deemed to be the act, omission or failure of such railroad."

Section 29 provides that the commission may regulate all practices affecting transportation which it finds to be unreasonable or unjustly discriminatory, whether defined in this act or not.

Section 30 provides for the investigation of fatal railroad accidents.

Section 31 makes it the duty of the commission to inquire into any neglect or violation of the laws of Nevada by any railroad or its agents, to enforce the provisions of the laws relating to railroads, and to report all violations thereof to the Attorney General. The Attorney General and prosecuting attorneys are required to assist the commission.

Section 32 provides for investigation by the commission of claims against railroads for damages to property.

Section 33 provides that technicalities shall be ignored.

"Sec. 34. This act shall not have the effect to release or waive any right of action by the state or by any person for any right, penalty, or forfeiture which may have arisen or which may hereafter arise under any law of this state; and all penalties and forfeitures accruing under this act, shall be cumulative and a suit for, and recovery of one, shall not be a bar to the recovery of any other penalty.

"Sec. 35. In addition to all the other remedies provided by this act for the prevention and punishment of any and all violations as to the provisions hereof and all orders of the commission, the commission can compel compliance with the provisions of this act, and of the orders of the commission by proceedings in mandamus, injunction or by other civil remedies.

"Sec. 36. Every railroad in this state, shall, within sixty days after the passage of this act, file in the office of the commission copies of all schedules of rates, including joint rates in force on its line or lines, between points within this state on the date this act takes effect.

"Sec. 37. Each section of this act and every part of each section is hereby declared to be independent sections and parts of sections and the holding of any section or part thereof to be void or ineffective for any cause shall not be deemed to affect any other section or any part thereof.

"Sec. 38. All acts and parts of acts in conflict with this act are hereby repealed."

William F. Herrin and P. F. Dunne, for Southern Pac. Co. and Nevada & California Ry. Co.

W. R. Kelly, A. S. Halsted, and Samuel Platt, for San Pedro, Los Angeles & Salt Lake R. Co.

Campbell, Metson & Brown and Campbell, Metson, Drew, Oatman & Mackenzie, for Tonopah & Goldfield R. Co.

Curtis H. Lindley and Samuel Platt, for Eureka & Palisade Ry. Co.

M. A. Murphy, for Virginia & Truckee Ry. Co.

Richard C. Stoddard, Atty. Gen., and H. F. Bartine, for defendants.

FARRINGTON, District Judge (after stating the facts as above). These suits were brought to prevent enforcement of the so-called "Railroad Commission Law" on the ground that it is repugnant to the federal and to the state Constitutions. Substantially the same issues are raised in each case, therefore all will be considered together.

1. The title of the act (St. 1907, p. 73, c. 44) is as follows:

"An act to regulate railroads, telegraph and telephone companies and other common carriers in this state, creating a Railroad Commission, constituting the Governor, the Lieutenant-Governor, and the Attorney-General a railroad board for the appointment and removal of the railroad commissioners, prevent the imposition of unreasonable rates, prevent unjust discrimination, insure an adequate railway service, and fixing maximum freight charges."

In brief, the act provides for the creation of a Railroad Commission, charges it with the administration and enforcement of the law, defines its powers and duties, fixes the compensation of its members, fixes maximum freight rates, empowers the commission to establish rates after investigation, prohibits unjust discrimination, provides methods of procedure to enforce the law, and fixes penalties for its violation. It empowers the commission to investigate infractions of the interstate commerce law, and apply to the railroads and to the Interstate Commerce Commission for relief. It also empowers the commission to investigate fatal accidents in railroad service. In section 37 it attempts to control the interpretation of the act itself by declaring that each section and every part of each section is independent, and the invalidity of any section or any part thereof shall not be deemed to affect any other section or part thereof. And finally, in section 38, it states that "All acts and parts of acts in conflict with this act are hereby repealed."

The act is unquestionably in conflict with previous legislation on the same subject. Thus the maximum compensation of 20 cents per ton mile provided in section 51 of the act of 1865 (St. 1865, p. 427, c. 146) is not in harmony with the elaborate scheme of maximum freight charges set out in section 7 of the act of 1907, where the rates range from one-half of one cent per mile for transporting one ton of rough stone to 20 cents per mile for hauling each ton of four times first-class freight.

The act of 1879 provides that each and every railroad shall fix its own rates, and that the rates so fixed shall not govern or affect the rate or rates of any other railroad company, provided such rates shall not exceed the rates now allowed by law. The act of 1907 permits the Railroad Commission, after investigation and a finding that former rates are unreasonable or unjustly discriminatory, to fix new rates, which must be reasonable but cannot exceed the prescribed maxima. Again, several sections of the act of 1907 cover practically the same ground embraced in the act of 1879, but with substantially different methods of procedure and different penalties.

Section 17 of article 4 of the Constitution of Nevada reads thus:

"Each law enacted by the Legislature shall embrace but one subject and matters properly connected therewith, which subject shall be briefly expressed in the title; and no law shall be revised or amended by reference to its title only; but, in such case, the act as revised, or section as amended, shall be re-enacted and published at length."

The design of the first of these provisions is not to contract the field of legislation, but to prevent the union in the same act of subjects having no necessary or proper connection. Each subject of legislation must stand alone, and, if enacted into law, it should succeed by reason of its own merits. Otherwise, by bringing into one bill divers disconnected subjects, and by combining the advocates of each in support of all, it might be possible to force the adoption of measures no one of which could pass on its own merits.

If it were permissible to insert in the same statute incongruous matters, some of which need not be expressed in the title, legislators might inadvertently vote for measures which they could not and would not

knowingly approve. So, also, unwise and vicious schemes might thus become law before there was opportunity to oppose them by protest or petition, or through the public press. The people are entitled to timely and adequate notice of all contemplated legislation. State v. Ah Sam, 15 Nev. 27, 32, 27 Am. Rep. 454; State v. Com'rs Humboldt Co., 21 Nev. 235, 237, 29 Pac. 974; People v. Mahaney, 13 Mich. 481, 494; State v. Hyde, 129 Ind. 296, 28 N. E. 186, 13 L. R. A. 79, 80.

In the title of the act of 1907 there is no suggestion of revising, amending, or repealing earlier legislation. The railroad acts of 1865 and 1879 are not referred to, nor is there any mention of the rule of construction formulated in section 37 of the act. In this the act is said to violate the first clause of the constitutional provision above recited. In other words, the act embraces not one, but several subjects, of which two are not expressed in the title.

A valid statute may embrace many matters and a multitude of details, but they must all relate to one general subject, which must itself be expressed in the title. Whether this subject shall be comprehensive or restrictive rests with the Legislature. The subject and the title may be broad enough to embrace the whole field of criminal law. In such a case the definition and punishment of larceny, embezzlement, and burglary might properly be included in the same act, but, if the act be entitled "An act to define and punish larceny," any attempt to include therein a definition of murder would be improper.

The details of a legislative act need not be specifically stated in its title, but matter germane to the subject as expressed in the title, and adapted to the accomplishment of the object in view, may properly be included in the act. State v. Atherton, 19 Nev. 332, 344, 10 Pac. 901. Thus it is proper to create in the same act the machinery by which the act is to be enforced, to prescribe the penalties for its infraction, and to remove obstacles in the way of its execution. If such matters are properly connected with the subject as expressed in the title, it is unnecessary that they should also have special mention in the title. It would be difficult to conceive of a matter more germane to an act and to the object to be accomplished thereby than the repeal of conflicting legislation. In such a case the practical working of the new statute would be aided by repeal of the old law.

Where a statute by implication amends or repeals a former law, such repeal is the effect and not the subject of the statute; and it is the subject, not the effect of a law, which is required to be briefly expressed in its title. If the necessary effect of the statute is to repeal previous legislation on the same subject, it does no violence to the Constitution by failing to express specifically such repeal in its title. 1 Lewis' Sutherland, Stat. Constr. pp. 223, 224; Cooley, Const. Lim. (7th Ed.) p. 208; People v. Mahaney, 13 Mich. 481, 494; Timm v. Harrison, 109 Ill. 593, 596; City of Winona v. School Dist., 40 Minn. 13, 41 N. W. 539, 3 L. R. A. 46, 12 Am. St. Rep. 687; Gabbert v. Jeffersonville R. R. Co., 11 Ind. 365, 71 Am. Dec. 358; Yellow River Imp. Co. v. Arnold, 46 Wis. 214, 232, 49 N. W. 971; Union Trust Co. v. Trumbull, 137 Ill. 146, 27 N. E. 24; Crookston v. Bd. of Co. Com'rs, 79 Minn. 283, 82 N. W. 586, 79 Am. St. Rep. 453, 454, 480.

In City of Winona v. School District, supra, the court remarks very pertinently:

"If the title of an act embraces only one subject, we apprehend it was never claimed that every other act which it repeals or alters by implication must be mentioned in the title of the new act. Any such rule would be neither within the reason of the Constitution, nor practicable. It would compel the Legislature in every instance to search the entire body of our statute law to ascertain what acts might be inconsistent with or repugnant to the provisions of the proposed act—a work, in many cases, so difficult as to amount to an impossibility."

Judge Cooley, in his work on Constitutional Limitations, p. 208, says:

"The repeal of a statute on a given subject, it is held, is properly connected with the subject-matter of a new statute on the same subject; and therefore a repealing section in the new statute is valid, notwithstanding the title is silent on that subject."

It is unnecessary to express any opinion as to whether the matter contained in section 37 relating to the construction of the act is germane to the subject expressed in its title. That section neither increases, diminishes, nor modifies the powers and duties imposed upon defendants. There is no allegation that its provisions are to be enforced by defendants in any manner or to the detriment of complainants. If it be foreign to the subject of the act, a conclusion which I cannot admit, it may be eliminated, and the balance of the act will stand. Cooley, Const. Lim. (7th Ed.) p. 211; 1 Lewis' Sutherland, Stat. Constr. p. 251; State v. Silver, 9 Nev. 227, 231; State v. Hoadley, 20 Nev. 317, 22 Pac. 99; State v. Beck, 25 Nev. 68, 81, 56 Pac. 1008.

2. It is also contended that the railroad commission act is unconstitutional because it is an amendatory statute, and as such it fails to conform to the constitutional provision, which declares that:

"No law shall be revised or amended by reference to its title only, but in such cases the act as revised or section as amended shall be re-enacted and published at length."

The Supreme Court of Nevada has interpreted this as requiring not only that the act or section as amended shall be re-enacted and published at length, but that "the title of the act to be amended should be referred to." State v. Hallock, 19 Nev. 384, 387, 12 Pac. 832, 833.

The question to be determined, then, is whether the railroad commission act is an amendatory statute within the meaning of the Constitution. This constitutional requirement was intended to prevent covert and improvident legislation. When amendments were made by mere reference to the place in the old law where words were to be substituted, stricken out or inserted, or alterations made, it was necessary, in order to understand the change, to compare the old law with the new. In case subsequent and successive amendments were made in the same manner, the confusion became such that it was extremely difficult to ascertain the precise terms of the law. Often the difficulty of making necessary examination and comparison was such that legislators and the public were mistaken, and even purposely misled, as to the effect and design of the amendatory enactments. Hence the

Constitution wisely ordained, in order that the full force and effect of the amendment might be apparent without reference to former statutes, that:

"No law shall be revised or amended by reference to its title only, but in such cases the act as revised or section as amended shall be re-enacted and published at length."

On the other hand, whenever a new statute is drafted, if it be necessary to refer to the title, and to publish and re-enact at length, as amended, every section in the whole body of existing statutory law affected thereby, legislation on many subjects would be practically impossible. Either in strict compliance with the rule, or out of abundant caution, a large portion of our state legislation would be republished and re-enacted at every session of the Legislature. Furthermore, an act complying with such a requirement would probably embrace more than one subject, and thus, in avoiding one prohibition of the statute, violate another. Hence, courts have not inclined to extend this prohibition beyond the mischief it was designed to prevent. Where a new act deals with the details of a former law and is designed to correct its defects and remedy its deficiencies without changing its general framework, then in order that the act as amended may be readily and fully understood, and the force and effect of changes appreciated, the original act or section as amended must be set out at length and its title referred to; but when a new act is complete in itself, when it does not purport to be amendatory of any previous act and requires no reference to another law to discover its scope and meaning, the mischief to be guarded against is not present and the reason for the rule fails. In such a case, though the new law has the effect of modifying a former law, it is not an amendatory statute within the meaning of the Constitution, and the previous law as modified or amended need not be re-enacted or published at length, nor is it requisite to the validity of the new law that it refer to the title of the old law.

"Hence, an act of the Legislature not amendatory in character, but original in form and complete in itself, exhibiting on its face what the law is to be, its purpose and scope, is valid, notwithstanding it may in effect change or modify some other law on the same subject." Warren v. Crosby, 24 Or. 558, 34 Pac. 661, 662: 1 Lewis' Sutherland, Stat. Constr. § 239; In re Dietrick. 32 Wash. 471, 476, 478, 73 Pac. 506; Northern Counties Investment Trust v. Sears, 30 Or. 388, 41 Pac. 931, 35 L. R. A. 188, 194; State v. Rogers, 107 Ala. 444. 19 South. 909, 32 L. R. A. 520, 522; Ex parte Pollard, 40 Ala. 98; In re Buelow (D. C.) 98 Fed. 86, 89; City of St. Petersburg v. English, 54 Fla. 585, 45 South. 483, 486; St. Louis, I. M. & S. Ry. Co. v. Paul, 64 Ark. 83, 40 S. W. 705, 37 L. R. A. 504, 508, 62 Am. St. Rep. 154; Erford v. City of Peoria, 229 Ill. 546. 82 N. E. 374, 375; People v. Mahaney, 13 Mich. 481, 497; Lake v. Palmer, 18 Fla. 501, 510; Hellman v. Shoulters, 114 Cal. 136, 44 Pac. 915, 919; Evernham v. Hulit, 45 N. J. Law, 53.

Sutherland, in the first volume of his work on Statutory Construction, at page 448, says that a statute which in general terms repeals all acts and parts of acts inconsistent with its provisions is not amendatory. In State v. Trolson, 21 Nev. 419, 432, 32 Pac. 930, 933, where the court had under consideration the constitutionality of a statute of 1887 (St. 1887, p. 81, c. 126), entitled "An act to further define and punish embezzlement," which neither referred to nor re-enacted any previous

law, in response to the contention that the statute was invalid because it was virtually an amendment of sections 4634 and 4635, Gen. St. Nev. 1885, Judge Bigelow, concurring, said:

"In my judgment the weight of authority and the more practical reason is with those that hold the general rule that the clause of the Constitution under consideration does not apply unless the subsequent statute is, in terms as well as in effect, an amendment of the preceding statute. Speaking of the constitutional provision that an amended section of a statute must be re-enacted and published at length, Judge Cooley says: 'It should be observed that statutes which amend others by implication are not within this provision; and it is not essential that they even refer to the acts or sections which by implication they amend.' (Const. Lim. 182.) This statement is well supported by the adjudged cases of many states. A statute is frequently so interwoven with others, and directly or indirectly modifies or amends so many others, and the rule contended for is itself so uncertain and indefinite, and in its nature incapable of reasonably fixed limits of application, that, as it seems to me, its adoption would lead to more uncertainty and confusion in the law than it would eliminate."

In order to understand the statute in question, it is unnecessary to compare it with former laws on the same subject. Its terms are plain and complete in themselves; they can be understood and executed without referring to previous legislation. On its face it is apparently a complete scheme for the accomplishment of its evident purpose and object. Neither the Legislature nor the public could fail to ascertain its meaning and purpose, or could be misled by an inspection of it. There is nothing which indicates or even suggests any covert or obscure purpose in the railroad commission act. David v. Portland Water Committee, 14 Or. 98, 12 Pac. 174, 179; Warren v. Crosby, 24 Or. 558, 34 Pac. 661, 663.

It is not a mere attempt to correct, to rectify, to reform, to improve, or to recast the old laws on the same subject. Both in the title and the body of the act, the intention to create a new law and not to amend an old one is apparent. It is not modeled along the lines followed by any former statute. It is essentially new and independent, and complete in itself.

It is contended that the act of 1907 is incomplete because a portion of the old law, notably the provision in section 51 of the act of 1865 providing a minimum freight charge, is still in force. A similar problem was presented in State v. Lee, 28 Nev. 380, 82 Pac. 229. Section 4 of an act entitled "An act providing for the creation of a State Board of Medical Examiners, and to regulate the practice of medicine and surgery in the state of Nevada" (St. 1899, p. 89, c. 73), authorized the secretary of the board to issue temporary certificates entitling the holder to practice medicine until the next regular meeting of the board. Subsequently an act was passed by the Legislature entitled "An act regulating the practice of medicine, surgery and obstetrics in the state of Nevada; providing for the appointment of a State Board of Medical Examiners and defining their duties; providing for the issuing of licenses to practice medicine; defining the practice of medicine; defining certain misdemeanors and providing penalties, and repealing all other acts, or parts of acts, in conflict therewith." St. 1905, p. 87, c. 113.

The latter statute contained no provision for temporary certificates,

and as it did not expressly repeal the former act it was claimed that the secretary still had the power to issue temporary certificates. The Supreme Court held that the earlier act, including the clause relating to temporary certificates, was entirely repealed by the statute of 1905. The later act, said the court, "is a comprehensive measure, complete in itself, revising the whole subject-matter of the act of 1899, and evidently intended as a substitute for it, although it contains no express words to that effect."

The railroad commission act provides for all freight charges, great or small. There is no uncovered territory to which the minimum charge of 35 cents, specified in the act of 1865, may be applied. If, under the rules and the maxima set out in section 7 of the act, the highest possible charge for transporting some small parcel is but 20 cents, can the commission disregard the express words of the act, "the commission shall not fix a greater rate, nor shall it allow any broad or standard gauge railroad to charge a greater rate than that fixed for the following classification"? Can the commission disregard this plain mandate, and permit a charge of 35 cents instead of 20 cents, simply because the minimum charge of 35 cents is provided for in the act of 1865, and is not expressly repealed?

While I am not unmindful of the concession made by defendants in this behalf, it is clear that the provision in the earlier statute for a minimum charge of 35 cents is superseded by the act of 1907, not only because of its manifest repugnancy but also because the comprehensive terms of the act as to rate regulation and its provisions, so entirely new to Nevada legislation, leave no room for any other conclusion than that the Legislature intended an act independent and complete in itself. The corollary to this is, the Legislature included in the new law all of the old law in relation to intrastate freight regulation which it intended to preserve, and that which is omitted was discarded. Black on Interp. Laws, p. 116; Thorpe v. Schooling, 7 Nev. 15, 18; Phillips v. Eureka Co., 19 Nev. 348, 353, 11 Pac. 32; King v. Cornell, 106 U. S. 395, 1 Sup. Ct. 312, 27 L. Ed. 60; United States v. Tynen, 11 Wall. 88, 92, 20 L. Ed. 153; Murdock v. City of Memphis, 20 Wall. 590, 642, 22 L. Ed. 429; United States v. Cheeseman, 3 Sawy. 424, Fed. Cas. No. 14,790; Columbia Wire Co. v. Boyce, 104 Fed. 172, 44 C. C. A. 588; Mack v. Jastro, 126 Cal. 130, 58 Pac. 373; Sponogle v. Curnow, 136 Cal. 580, 69 Pac. 255, 256; City of Seattle v. Clark, 28 Wash. 717, 69 Pac. 407, 410; State v. Conkling, 19 Cal. 501.

It is not necessary that the new act should cover the whole subject-matter of the former acts. It will be sufficient if it is reasonably complete upon that distinct branch of the subject with which it professes to deal. People v. Knopf, 183 Ill. 410, 56 N. E. 155, 157.

"That there are points of difference between the two acts can constitute no reason why fragments of the former should be held to continue in operation when its substantial provisions are replaced. That which was regulated by the first statute is now regulated by the second." State v. Carbon Hill Coal Co., 4 Wash. 423, 30 Pac. 728.

The objection to the act on the ground that it contains no reference to the title of former acts on the same subject, and that it does not

re-enact or publish at length former statutes which may be amended by implication, is without merit.

3. Again, it is urged that this act is invalid because it violates section 21, art. 4, of the Constitution of Nevada, in which it is declared that "where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state," and because it is repugnant to the fourteenth amendment to the Constitution of the United States, in that by an unjust classification it denies equal protection of the laws.

Section 7 of the act provides that:

"All narrow-gauge railroads may be permitted by the commission to charge a rate not to exceed one hundred and fifty per cent. higher than those mentioned for broad-gauge railroads."

And again:

"That the maximum rates herein fixed shall not apply to any railroad until the said road shall have been constructed and in operation for two years between the points where they shall commence to deliver freights."

In Ames v. Union Pac. Ry. Co. (C. C.) 64 Fed. 165, 171, it was held that a statute prescribing maximum rates, and exempting from its operation until December 31, 1899, all roads built prior to that date and subsequent to January 1, 1889, did not deny to other carriers the equal protection of the law.

"The principle of classification adopted by the Legislature, whether wise or unwise, is within its power. To divide railroads into two classes, placing in the one all that have been constructed and in operation for a length of time, and whose business must therefore be presumed to have been thoroughly established, and in the other all only recently constructed, is clearly not a mere arbitrary distinction; and this notwithstanding it may be that one of the recently constructed roads is so fortunate as to have immediately secured a large business."

In Covington, etc., Turnpike Co. v. Sandford, 164 U. S. 578, 598, 17 Sup. Ct. 198, 206, 41 L. Ed. 560, it was held that the constitutional provision forbidding a denial of the equal protection of the law—

"does not require that all corporations exacting tolls should be placed on the same footing as to rates, but that justice to the public and to the stockholders may require in reference to one road rates different from those prescribed for other roads; and that rates on one road may be reasonable and just to all concerned, while the same rates would be exorbitant on another road."

In Home Telegraph & Telephone Co. v. City of Los Angeles (C. C.) 155 Fed. 554, 580, Judge Wellborn says:

"A moment's reflection shows that the mere fact that different rates are prescribed for two companies does not, of itself, establish unlawful discrimination against either."

What is a reasonable charge depends upon the circumstances of each case; and among such circumstances are the fair present value of the plant, the operating expenses, the volume and character of the business, and the reasonable value to the public of the service performed. Obviously these circumstances cannot be the same for any two railroads. One railroad does an immense business, while another does but little. One is operated at less expense than another by reason of the nature

of the country through which it passes, or because of the relative cheapness of fuel, labor, and supplies. One has an expensive plant and is burdened with an enormous debt, while another was constructed cheaply and owes nothing. One runs through a populous territory, and another pushes out into the desert, hoping to develop business. All these circumstances must be considered by the rate-fixing agency. With such varying factors equal results are out of the question. It is doubtful whether it would be possible to adopt a uniform schedule of rates for any two railroads in the state which would not operate more or less unequally and unjustly. A rate fair for one railroad would be unfair for another. It is in recognition of this fact that the Legislature has authorized the commission to establish rates within the statutory maxima which shall apply to but one railroad. And this it is which also justified the Legislature in delegating that authority to the commission.

The power of the Legislature to classify railroads is clear, provided the classification is reasonable and not arbitrary. The classification should be based upon some real and substantial difference between the classes; a difference which bears some relation to and justifies higher rates for one class than for another. It has been held that the Legislature may classify railroads according to the amount of business done, and establish a maximum of rates for each class; because it is only reasonable to suppose that a large volume of freight can be transported at less expense per ton than a small quantity. Chicago, etc., R. R. Co. v. Iowa, 94 U. S. 155, 24 L. Ed. 94.

Again, it has been decided that for rate-fixing purposes a classification may be according to the length of the railroad lines, or according to the locality in which they are situated, or on the basis of their gross earnings. Dow v. Beidelman, 125 U. S. 680, 691, 8 Sup. Ct. 1028, 31 L. Ed. 841; Wellman v. Railway Co., 83 Mich. 606, 47 N. W. 493.

The length of the road, the amount of its gross earnings, or the locality in which it is situated, each bears a very apparent relation to the expense of operation, and hence serves as an appropriate test of classification for the purposes of regulating railroad traffic charges.

The federal Constitution does not withhold from the Legislature the power of classifying railroads for the purpose of establishing rates. If the classification is reasonable and not arbitrary, and if the same law is applied to all railroads of the same class, though it may be different for the separate classes, there is no violation of the rule securing to all the equal protection of the law. Dow v. Beidelman, 125 U. S. 680, 8 Sup. Ct. 1028, 31 L. Ed. 841; Gulf, etc., Ry. v. Ellis, 165 U. S. 150, 155, 17 Sup. Ct. 255, 41 L. Ed. 666; Commonwealth v. Clarke, 195 Pa. 634, 46 Atl. 286, 57 L. R. A. 348, 349, 86 Am. St. Rep. 694; Commonwealth v. Interstate, etc., Ry. Co., 187 Mass. 436, 73 N. E. 531, 11 L. R. A. (N. S.) 973.

In the last case a Massachusetts statute required street railway companies to carry school children to and from school at half rates, but excepted the Boston Elevated Railway from the operation of the law. It was claimed that other street railways were thus deprived of the equal protection of the law. The court sustained the classification in these words:

"The situation of the lines of the Boston Elevated Railway Company in the midst of a dense population is so different from that of other lines in the state, and their fitness for use by children in going to and from the public schools might be found by the Legislature to be so unlike that of street railways generally in the state, as properly to call for an exemption from the law established for others. We cannot say that the Legislature had no power to make this distinction, founded on differences in conditions."

Tested by these principles, the methods of classification adopted in the railroad commission act are not violative of either the federal or the state Constitution. The law operates uniformly on the members of each class. The statute differentiates between old railroads which presumably have an established business, and recently constructed roads, presumably with a business yet to be developed. It also segregates the broad-gauge railway, with its capacity for handling immense loads and enormous traffic, from the narrow-gauge railroad with its short haul, short trains, small engines, light traffic, and relatively large expense for train crews. These differences furnish a reasonable basis for a higher maximum freight charge in one case than in the other, and therefore justify the classification which is attacked.

4. In the first section of the railroad act it is declared that the Governor, Lieutenant Governor, and Attorney General shall constitute a railroad board for the purpose of appointing railroad commissioners. The constitutionality of this act is challenged on the ground that the power of appointment thus exercised and provided for in the act is intrinsically and exclusively an executive function, which cannot be exercised by the Legislature; that the Legislature under the Constitution is powerless to select the members of the railroad board, or to commit to that board the appointment of railroad commissioners.

If the act provides no method for selecting commissioners who are to enforce its provisions, it must fall. The Constitution nowhere in express terms withholds from the Legislature the power of appointment; neither does it expressly declare that power to be exclusively an executive function. It divides the powers of government into three separate departments—the legislative, which makes; the executive, which executes; and the judicial, which interprets the law; and it declares that:

"No person charged with powers properly belonging to one of these departments shall exercise any function appertaining to either of the others, except in the cases herein expressly directed or permitted."

Such distribution and separation of governmental power is found in the organic law of every state in the Union. In several state constitutions, notably in that of Ohio, in order to define more clearly the line of demarkation between legislative and executive activity, or in order to further limit legislative authority, it is expressly provided that no appointing power shall be exercised by the General Assembly. But no such provision is found in the Constitution of Nevada. In the light of this circumstance, our Supreme Court, in State v. Irwin, 5 Nev. 111, 127, and State v. Swift, 11 Nev. 128, 138, was led to the conclusion that:

"In the Constitution of the state of Nevada, the appointing power of the Legislature is neither cut up by the roots, nor in any manner hampered, save where the Constitution itself, or the federal Constitution, provides for filling

a vacancy. * * * In every other case the power is in the Legislature, to be by it regulated by law."

The only definition of the Governor's power of appointment in the Nevada Constitution appears in section 8, art. 5, and is as follows:

"When any office shall, from any cause, become vacant, and no mode is provided by the Constitution and laws for filling such vacancy, the Governor shall have the power to fill such vacancy by granting a commission which shall expire at the next election and qualification of the person elected to such office."

Section 1 of the same article reads thus:

"The supreme executive power of this state shall be vested in a chief magistrate, who shall be Governor of the state of Nevada."

As to the power of the Legislature in making appointments, the Constitution in section 10, art. 15, speaks thus:

"All officers whose election or appointment is not otherwise provided for shall be chosen or appointed as may be prescribed by law."

If it were the intention to vest all appointing power in the chief executive, why was it not so declared? Why was it not ordained that "all officers whose election or appointment is not otherwise provided for shall be chosen" by election from the people "or appointed" by the Governor, "as may be prescribed by law"?

In the Irwin Case there was a statute organizing White Pine county, and appointing the individuals who should fill its offices until the next general election. In the Swift Case, an act incorporating the city of Carson named and appointed the persons who should serve as city trustees for the first year. These were clearly legislative appointments which the "Legislature had the power to make for the purpose of putting the new system into operation." State v. Arrington, 18 Nev. 412, 4 Pac. 735; State v. Torreyson, 21 Nev. 517, 526, 34 Pac. 870; State v. Ruhe, 24 Nev. 251, 263, 52 Pac. 274.

But it does not appear that the exigencies which required and justified "provisional appointments" in those cases were of such an urgent character that the county officers in one instance and the city trustees in the other could not have been appointed by the Governor, if he was then the exclusive repository of appointing power.

While the Constitution vests the legislative authority of the state in a "Senate and Assembly designated the Legislature of the state of Nevada," it vests not the executive power, but "the supreme executive power of this state" in the Governor. This, and the further fact that the chief executive is authorized to fill vacancies not otherwise provided for, does not necessarily lead to the conclusion that all executive power, or all right to exercise appointing power, is vested in the Governor, to the exclusion of other state officers, such as the Lieutenant Governor and Attorney General.

This subject is thus discussed in Cooley on Const. Lim. (6th Ed.) p. 133:

"The authority that makes the laws has large discretion in determining the means through which they shall be executed, and the performance of many duties which they may provide for by law they may refer either to the chief executive of the state, or, at their option, to any other executive or ministerial

officer, or even to a person specially designated for the duty. What can be definitely said on this subject is this: That such powers as are specially conferred by the Constitution upon the Governor, or upon any other specified officer, the Legislature cannot require or authorize to be performed by any other officer or authority; and from those duties which the Constitution requires of him he cannot be excused by law. But other powers or duties the executive cannot exercise or assume except by legislative authority; and the power which in its discretion it confers, it may also, in its discretion, withhold, or confide to other hands."

All power to appoint officers as an implied executive function, where the Constitution is silent on that subject, is not vested in the Governor. State v. Boucher, 3 N. D. 389, 56 N. W. 142, 21 L. R. A. 539, 544; Overshiner v. State, 156 Ind. 187, 59 N. E. 468, 51 L. R. A. 748, 83 Am. St. Rep. 187; Sinking Fund Commissioners v. George, 104 Ky. 260, 47 S. W. 779, 84 Am. St. Rep. 454; Eddy v. Kincaid, 28 Or. 537, 41 Pac. 156; Mayor of Baltimore v. State, 15 Md. 376, 74 Am. Dec. 572; Travelers' Ins. Co. v. Oswego, 59 Fed. 58, 65, 7 C. C. A. 669; Fox v. McDonald, 101 Ala. 51, 13 South. 416, 21 L. R. A. 529, 536, 46 Am. St. Rep. 98; Biggs v. McBride, 17 Or. 640, 21 Pac. 878, 5 L. R. A. 115; People v. Freeman, 80 Cal. 233, 22 Pac. 173, 13 Am. St. Rep. 122; In re Bulger, 45 Cal. 553, 558.

If in the statute in question certain non office holding individuals were designated by name to be members of and to constitute the railroad board, undoubtedly it would be an appointment by the Legislature. But this is not the case. The duty of serving as members of the railroad board and of appointing commissioners is by the act attached and added to the duties and powers of the offices of Governor, Lieutenant Governor, and Attorney General.

In State v. Kennon, 7 Ohio St. 546, cited and relied on by complainants, it is correctly held that the appointing power cannot lawfully be exercised by the General Assembly of Ohio, except in the selection of United States Senators, and officers of the Assembly itself, because the Constitution of that state declares that "no appointing power shall be exercised by the General Assembly." The Ohio Constitution leaves no room for doubt on that point.

In the Kennon Case there was called in question the validity of an act of the General Assembly, by which a board of statehouse commissioners was created, composed of three members to be appointed by three non office holding individuals, designated in the act as William Kennon, Asahel Medbery, and William Caldwell. The court held that the three individuals named, if duly appointed, were officers by virtue of the appointment, but, having been appointed by the General Assembly, the appointment was void, because the Assembly had no authority under the Constitution to exercise the power of appointment. The Legislature may pass a law providing how an appointment shall be made, but it cannot make the appointment; in other words, it can make, but it cannot execute, the law. In a concurring opinion, Judge Swan says:

"We do not decide whether a board of appointment, such as those laws create, may or may not be constitutionally created; for it is unnecessary to decide it. But we hold that the General Assembly cannot appoint the officers of such a board. Whether the General Assembly can annex the power of appointment * * * of commissioners to the office of Governor, or to any other

existing office or board, we do not decide, simply because the question is not before us."

Judge Swan demonstrates the existence of such a power thus:

"If the General Assembly annex to an office already existing and filled additional powers and duties, upon what ground can it be claimed that this is the exercise by the General Assembly of the appointing power? Certainly upon this only, that the General Assembly has enlarged or added to the powers and duties of an existing office. But this is really absurd; for, if adding to the duties or powers of existing offices is an exercise of the appointing power, then every new duty required, or power conferred upon any state, county, or township officer, must be deemed the exercise by the General Assembly of the appointing power and forbidden by the Constitution.

"But these fallacious positions arise out of a misapprehension of what is meant by the exercise of the appointing power. An office, until filled, is an impersonal thing, an incorporeal hereditament. It is filled by the exercise of the appointing power, and, when filled, the office and officer both exist. The office itself may by law be enlarged in its powers, or new duties enjoined, without touching the appointment or tenure of office of the incumbent or his successor. It would, therefore, seem highly probable, although the question is not before us, that the General Assembly could, without displacing or appointing a governor of Ohio, annex to the office of Governor the power of appointing directors of the penitentiary, or the duty of performing any other legitimate executive function.

"If the General Assembly conferred upon the incumbent of the gubernatorial chair official public powers as an individual, so that he would continue to exercise the powers thus conferred, whether he continued to hold the office of Governor or not, it would seem quite manifest, to my mind, that the General Assembly created an office in such case, and exercised the appointing power."

In State v. Washburn, 167 Mo. 680, 67 S. W. 592, 90 Am. St. Rep. 430, cited by complainants, there was under consideration a Missouri statute which empowered the Governor to appoint a board of three election commissioners in certain cities of that state, but required that one of the members should be selected from a list of three, to be presented by the city central committee of the leading party politically opposed to that to which the other appointees belonged. The Governor of Missouri appointed three commissioners for Kansas City, but ignored the central committee nominations. The court said that such power in a central committee is, or by cunning practice could be made, equivalent to the power of appointment. If the Legislature had attempted to make the third appointment itself, the act would have been void as an attempt to exercise executive power. If a valid power to make an appointment is conferred on a nonofficial person, the person on whom it is conferred becomes ipso facto a public officer.

"When, therefore," said the court (page 695 of 167 Mo., page 595 of 67 S. W. [90 Am. St. Rep. 430]), "the General Assembly undertook to confer the power to appoint the third election commissioner of Kansas City on a body of men not officially connected with the state government, it undertook, in effect, to create an office to exercise the governmental function of filling by appointment another public office, and not only to create such office, but to name by description the men who were to fill it; in effect, creating the office and appointing the incumbents, making the law and executing it. Section 9, art. 14, gives no such power, and article 3 forbids it."

In State v. Hyde, 129 Ind. 296, 28 N. E. 186, 13 L. R. A. 79, under constitutional provisions similar to our own, an Indiana statute au-

thorizing the state geologist, an officer elected by the people, to appoint a state supervisor of oil inspection, was sustained.

In Biggs v. McBride, 17 Or. 640, 21 Pac. 878, 5 L. R. A. 115, 119, under constitutional provisions like those of Nevada, the Supreme Court of Oregon refused to declare invalid an act of the Legislature vesting in the Legislature itself the appointment of railroad commissioners.

In Bridges v. Shallcross, 6 W. Va. 562, the Legislature of West Virginia had passed an act providing that the Governor, Auditor, Treasurer, Superintendent of Free Schools, and Attorney General of that state should constitute a board of public works. A few months later a second act was passed authorizing inter alia the board of public works to appoint a board of directors of the penitentiary, to consist of five persons. It was held that this legislation did not operate as an appointment of the Governor and other officers to another and a different office, but simply annexed to the several executive offices named certain additional powers and duties, and consequently the acts were not unconstitutional.

In Shoemaker v. United States, 147 U. S. 282, 300, 13 Sup. Ct. 361, 391, 37 L. Ed. 170, an act of Congress created a park commission to be composed of the Chief of Engineers of the United States army, the Engineer Commissioner of the District of Columbia, and three citizens to be appointed by the President, by and with the advice and consent of the Senate. It was urged that the act was invalid because Congress had no power to appoint the two engineers. In reply to this the court said:

"There are several features that are pointed to as invalidating the act. The first is found in the provision appointing two members of the park commission, and the argument is that, while Congress may create an office, it cannot appoint the officer; that the officer can only be appointed by the President with the approval of the Senate, and that the act itself defines these park commissioners to be public officers. * * * As, however, the two persons whose eligibility is questioned were at the time of the passage of the act and of their action under it officers of the United States who had been theretofore appointed by the President and confirmed by the Senate, we do not think that because additional duties, germane to the offices already held by them, were devolved upon them by the act, it was necessary that they should be again appointed by the President and confirmed by the Senate. It cannot be doubted, and it has frequently been the case, that Congress may increase the power and duties of an existing office without thereby rendering it necessary that the incumbent should be again nominated and appointed."

The power to appoint all officers whose election by the people is not provided for in the Constitution of Nevada cannot be held to be a part of the chief executive power of the state which is vested in the Governor. The Legislature may by law require the Governor, Lieutenant Governor, and Attorney General of the state to select and appoint railroad commissioners. This is not an appointment of those officers to a new office, but an increase in their official power and duty. Even if it be conceded that the Constitution forbids the exercise of the appointing power by the Legislature, still the act in question is not for this reason repugnant to that instrument, because no appointing power, as contemplated by the prohibition, has been exercised by the Legislature.

5. The business of the company is either interstate or intrastate traffic. All business which originates out of, comes into, and is laid down in the state, all business which originates in and passes out of the state, and all business which originates out of, passes through, and is delivered outside the state, is classed as interstate. All business which is picked up, carried, and delivered wholly within the state of Nevada is intrastate or domestic business.

It is only the intrastate business which can be considered in these proceedings. With the regulation of rates, tolls, and charges on interstate traffic, the Legislature has nothing to do. It is well settled that a state, either through its Legislature or by a railroad commission, may make and regulate rates, charges, and tolls for intrastate traffic, and that this subject is primarily within the control of the state. This power finds its root in the old common law. When a man parts with his property it is no longer his; when he devotes it to the public use it ceases to be private property.

"He, in effect, grants to the public an interest in such use, and must, to the extent of that interest, submit to be controlled by the public for the common good as long as he maintains the use. When private property is devoted to public use, it is subject to public regulation; if the right to regulate exists, the right to establish the reasonable compensation for services as one of the means of regulation is implied." Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77.

If the state prescribes a schedule of maximum rates for transportation of intrastate freight, the rates must be reasonable; that is, they must be reasonable both to the carrier and to the public. It must always be remembered that the carrier is entitled to a just and reasonable compensation for his services and for the use of his property devoted to public service. This compensation up to the full measure of what is just and reasonable is his property, and is protected by that provision of the federal Constitution in which it is ordained that no state shall "deprive any person of life, liberty or property without due process of law, nor deny any person within its jurisdiction the equal protection of the laws."

"If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law and in violation of the Constitution of the United States; and, in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the laws." Chicago, etc., Ry. Co. v. Minnesota, 134 U. S. 418, 456, 458, 10 Sup. Ct. 462, 467, 33 L. Ed. 970.

Bearing these principles in mind, it is first in order to ascertain the reasonable value of that portion of the Southern Pacific Company's property which is devoted to the movement of intrastate freight; that is, to transportation which both begins and ends in the state. The rule for ascertaining such value is thus stated in Smyth v. Ames, 169 U. S. 466, 544, 546, 18 Sup. Ct. 418, 433, 434, 42 L. Ed. 819:

"It cannot, therefore, be admitted that a railroad corporation maintaining a highway under the authority of the state may fix its rates with a view solely to its own interests, and ignore the rights of the public. But the rights of the

public would be ignored if rates for the transportation of persons or property on a railroad are exacted without reference to the fair value of the property used for the public or the fair value of the services rendered, but in order simply that the corporation may meet operating expenses, pay the interest on its obligations, and declare a dividend to stockholders.

"If a railroad corporation has bonded its property for an amount that exceeds its fair value, or if its capitalization is largely fictitious, it may not impose upon the public the burden of such increased rates as may be required for the purpose of realizing profits upon such excessive valuation or fictitious capitalization; and the apparent value of the property and franchises used by the corporation, as represented by its stocks, bonds, and obligations, is not alone to be considered when determining the rates that may be reasonably charged. * * *

"The basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is° that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

The evidence discloses but little testimony as to the present reasonable value of the property in question. The Southern Pacific Company operates under a lease the Central Pacific Railway Company's property in Nevada, and it is the value of this property which we are to ascertain.

Mr. Seger, auditor of the Southern Pacific Company, testifies that the total issued capital stock, both common and preferred, of the Central Pacific Railway Company, is $80,675,500, and its funded debt to July 1, 1907, $116,947,043.12—total, $197,622,543.12.

There is no evidence as to the market value of either stocks or bonds. For aught that appears in the record, the price may be either 50 per cent. above or 50 per cent. below par. The present value of these stocks and bonds, even though precisely determined, is not an absolutely reliable measure of the fair, reasonable worth of the property represented, because stock quotations often go up or down without much reference to intrinsic value of property; they may in part represent property which is neither used nor useful for transportation in Nevada; they may in greater or less degree represent moneys which were devoted to unwise or extravagant expenditures and investments, or to uses and projects foreign to the business of transporting freight in this state; and they may represent money expended for machinery, equipment, stock, and constructions which are worn out and antiquated, and therefore no longer in use.

It is also in evidence that the total cost of the entire line of road of the Central Pacific Railway Company to June 30, 1907, was $212,970,-953.07. Of this amount $66,253,187.21 is the value of that portion of the property located in Nevada. It is probably safe to assume that

this amount includes not only the entire cost of originally constructing and equipping the road, but also the cost of all subsequent constructions, repairs, replacements, and equipment. If this conclusion is correct, it is probable that $66,253,187.21 exceeds the reasonable value of the property used in Nevada.

The cost of a plant devoted by its owner to public service is not always a reliable criterion of its reasonable value; it may have cost too much, or it may have been constructed on a scale too large for the needs of the public which it is intended to serve. However, the accuracy of these figures has not been challenged except in this: the defendants argue that the failure of complainant to produce evidence as to the cost of reproducing the road is fatal to its case. The cost of reproducing the physical structures of a railroad is not necessarily equivalent to the reasonable value of the road at the time it is being used. Such a standard may be either too narrow or too broad to serve as the measure of present reasonable value. For instance, it does not cover the fact that decay and use may have impaired the value of the property, or that the road has an established business, which imparts a value in addition to the value of its physical constructions.

Each case must depend largely on its own special facts, and every element or circumstance which increases or depreciates the value of the property should be given due consideration and allowed that weight to which it is entitled. Neither the fair value of stocks and bonds, the cost of construction, nor the cost of reproducing the plant, is absolutely controlling, but each should be regarded as a fact tending to show fair value. Milwaukee, etc., Co. v. Milwaukee (C. C.) 87 Fed. 577, 585; Metropolitan Trust Co. v. Houston, etc., R. R. Co. (C. C.) 90 Fed. 683, 687, 689; San Diego Water Co. v. San Diego, 118 Cal. 556, 50 Pac. 633, 38 L. R. A. 460, 463, 62 Am. St. Rep. 261.

The decision in Ames v. Railway Co. (C. C.) 64 Fed. 165, 177, gives countenance to the contention that "if there is no other testimony in respect to value of the railroad property than the amount of stocks and bonds outstanding, or the construction account, it may be fairly assumed that one or the other of these represents it."

I shall therefore assume, without deciding it to be a fact, that the construction account represents the fair value of the property; and that $66,253,187.21 is the fair and reasonable value of the Central Pacific Railway Company's property in Nevada which is used in part for the transportation of intrastate freight.

A reasonable return on this valuation should be required from the whole Nevada business done on the Central Pacific Railway, and only a fair proportion thereof from the intrastate freight traffic. The gross receipts of the company from all sources in Nevada during the year 1907 were $12,005,443.23. The total receipts from intrastate freight were $159,791.40, or 1.33096+ per cent. of the gross receipts. Intrastate freight may therefore be charged with 1.3309+ per cent. of $66,253,187.21, or $881,763.67. The annual interest on the bonded debt of the Central Pacific Railway Company is $4,476,538.79. The proportionate amount chargeable to its mileage in Nevada is $1,369,-

149.88, and to its Nevada intrastate traffic is $18,222.01. The total amount of issued stock, both common and preferred, is $80,673,500, the proportionate amount chargeable to mileage in Nevada is $25,090,-080.50, and to Nevada intrastate traffic is $333,923.88.

It also appears from the testimony of Mr. Seger that taxes in the state of Nevada on the company's property for the same fiscal year were $172,562.89. Of this amount the intrastate freight traffic should bear 1.3309+ per cent., or $2,296.64.

6. It has been asserted repeatedly in the course of these proceedings that under its present tariffs the Southern Pacific Company is conducting its Nevada intrastate business at a loss, and that such loss will be greatly increased if the maximum rates set out in section 7 of the act in question are enforced. This conclusion seems to be the result of a line of reasoning which is based principally on tables 1 and 7 attached to Mr. Seger's affidavit.

An element of the highest importance which enters into the construction of these tables is the undisputed testimony of complainant's experts, that as regards the conduct of transportation the cost of local freight business in Nevada is relatively greater than the cost of the business of the company as a whole, and the proportion is fairly stated as 3 to 1. The term "conducting transportation" is used to distinguish that class of operating expenses which is neither maintenance of way and structures, maintenance of equipment, nor general expense. Now it is only as to conducting transportation that the cost is claimed to be greater for local than for general traffic. Other items of expenditure are constant. They are practically the same for all kinds of traffic: A through train moves from the beginning to the end of its journey with a full complement of fully loaded cars, stopping only for fuel, water, orders, and other trains. On the other hand, a local train moves with a constantly diminishing load; it stops for fuel, water, orders, and other trains, and also to deliver freight; consequently, while the expense of each train for power and crew is practically the same for each day's service, the through train occupies less time and performs a greater service; that is, it moves its whole initial tonnage for a greater number of miles. This has frequently been recognized as a matter of fact by the courts. Ames v. Union Pac. Co. (C. C.) 64 Fed. 165, 184; Northern Pac. Ry. Co. v. Keyes (C. C.) 91 Fed. 47, 54; Minneapolis, St. Louis R. R. Co. v. Minnesota, 186 U. S. 257, 262, 22 Sup. Ct. 900, 46 L. Ed. 1151; Chicago, etc., Ry. Co. v. Tompkins, 176 U. S. 167, 178, 20 Sup. Ct. 336, 340, 44 L. Ed. 417.

In the last case cited this language is used:

"Beyond the figures given from the books of the company of the actual cost of doing the total business of the company, there was the testimony of several experts as to the relative cost of doing local and through business. Such testimony is not to be disregarded simply because it cannot demonstrate by figures the exact amount or per cent. of the extra cost. It is obvious on a little reflection that the cost of moving local freight is greater than that of moving through freight, and equally obvious that it is almost if not quite impossible to determine the difference with mathematical accuracy. Take a single line of 100 miles, with 10 stations. One train starts from one terminus with through freight, and goes to the other without stop. A second train

starts with freight for each intermediate station. The mileage is the same. The amount of freight hauled per mile may be the same, but the time taken by the one is greater than that taken by the other. Additional fuel is consumed at each station where there is a stop. The wear and tear of the locomotive and cars from the increased stops and in shifting cars from main to side tracks is greater; there are the wages of the employés at the intermediate stations, the cost of insurance, and these elements are so varying and uncertain that it would seem quite out of reach to make any accurate comparison of the relative cost. And if this is true when there are two separate trains, it is more so when the same train carries both local and through freight. It is impossible to distribute between the two the relative cost of carriage. Yet that there is a difference is manifest, and upon such difference the opinion of experts familiar with railroad business is competent testimony, and cannot. be disregarded."

No particular ratio can be established as a matter of law. The relative cost of domestic and interstate traffic must depend always upon the peculiar facts of each case. Of the freight which is shipped, carried, and delivered wholly within the state, much may be transported by what is practically a through movement; that is, by fully loaded trains, taken without interruption to their destination from the starting point. And, on the other hand, much interstate freight originating out of the state may be carried by what is essentially a local movement; that is, it may be distributed by way trains at various stations after it reaches the state.

In the affidavit of R. E. Wells, general manager of the San Pedro, Los Angeles & Salt Lake Railroad Company, filed here for the benefit of that company, after reciting the peculiar conditions under which that road conducts its local business in Nevada, and after excluding items of expense chargeable as maintenance of way, taxes, and returns upon the value of the road, the affiant says that the cost of conducting traffic—that is, the cost of handling, moving, receiving, and delivering freight upon that railroad in Nevada—is not less than ten times as great per unit of traffic in the case of local business as in the case of through business.

In view of the stipulations permitting any part of the affidavits, testimony, or depositions filed in any one of the cases against Bartine et al. now before this court to be considered as evidence in each of the other cases, it is earnestly contended that the ratio of 10 to 1 should be applied to the Southern Pacific business, as expressing more accurately the relative cost of local and general freights. This, however, cannot be conceded in the absence of a showing that conditions on the Southern Pacific and the San Pedro Railroads are and were alike as regards that matter.

In the absence of any contradictory testimony, it must be found as a fact that:

"The cost of local freight business (of the Southern Pacific Company) in the state of Nevada is relatively greater than the cost of the general business of the company—that is to say, of its business as a whole—and that a fair, just and conservative estimate of the greater relative cost of such local business is that such cost as related to the cost of said general business is in the proportion of 3 to 1."

The following tables are referred to:

170 F.—48

Table 1.

Southern Pacific Company.

Statement Showing Cost of Local Business and Loss that would have been Sustained Thereon under Railroad Commission Bill for Fiscal Year 1907.

| Conducting Transportation. | Percentage of Operating Expenses and Taxes to Gross Receipts of System. | Additional Cost of Local Business. | Total Cost of Local Business. | Loss or Gain under Present Rates. | Loss in Earnings under Railroad Commission Bill. | Total Loss under Said Bill. |
|---|---|---|---|---|---|---|
| Basis, | | | | | | |
| 2 to 1 | 62.22 | 30.85 | 93.07 | +6.93 | 35.58 | 28.65 |
| 3 to 1 | 62.22 | 61.70 | 123.92 | —23.92 | 35.58 | 59.50 |

Gross earnings of system.................................$83,309,535.26
Operating expenses and taxes.......................... 51,837,475.34—per cent. 62.22
Conducting transportation............................. 25,802,158.24—per cent. 30.85

Table 6.

Central Pacific Railway.

Statement of Southern Pacific Company of Earnings and Expenses Accruing within State of Nevada for Fiscal Year 1907, as Apportioned Between Freight and Passenger Traffic, with Percentages of Expenses to Earnings.

| | Earnings. | Expenses. | Per cent. of Freight Earnings. | Per cent. of Passenger Earnings. | Per cent. of Total Earnings. |
|---|---|---|---|---|---|
| Freight ............. | $8,812,890.98 | | | | |
| Maintenance of way......... | | $413,485.36 | 4.97 | | 8.44 |
| Maintenance of equipment.. | | 863,474.29 | 10.35 | | 7.17 |
| Conducting transportation.. | | 1,768,492.22 | 21.27 | | 14.73 |
| General expenses........... | | 149,292.78 | 1.81 | | 1.24 |
| Total ............. | | $3,191,745.65 | 38.40 | | 26.58 |
| Passenger ......... | $3,692,352.25 | | | | |
| Maintenance of way......... | | $327,467.63 | | 8.87 | 2.73 |
| Maintenance of equipment.. | | 395,161.48 | | 10.70 | 3.29 |
| Conducting transportation.. | | 1,028,997.70 | | 27.87 | 8.57 |
| General expenses........... | | 118,435.29 | | 3.21 | .99 |
| Total ............. | | $1,870,082.10 | | 50.65 | 15.58 |
| Sum Total............. | $12,005,443.23 | $5,061,827.75 | | | 42.16 |

## Table 7.

### Southern Pacific Company—(System).

#### Fiscal Year 1907.

| Gross Receipts on Local Tonnage. | Percentage of Expenses to Earnings— Basis 2 to 1. Basis 3 to 1. | Cost of Hauling Local Freight. | Net Earnings from Local Freight. | Amount of Reduction Under Bill. | Amount Gain or Loss Under Bill. | Per cent. Gain or Loss. |
|---|---|---|---|---|---|---|
| $159,791.40 | 93.07 | $148,717.86 | +$11,073.54 | $56,853.78 | —$45,780.24 | —28.65 |
| 159,791.40 | 128.92 | 198,013.49 | —38,222.09 | 56,853.78 | —95,075.87 | —59.50 |

Complainant's position may be stated thus:

Table 1 shows for the fiscal year 1907 the gross earnings of the entire Southern Pacific System were $83,309,535.25, and the gross operating expenses and taxes $51,837,475.34, or 62.22 per cent. of the gross receipts. Of these expenses the cost of conducting transportation, as distinguished from the cost of maintenance of way and of equipment and general expenses, was $25,802,138.24, or 30.85 per cent. of the gross receipts, while the cost for maintenance of way, etc., was $26,025,337.10, or 31.37 per cent. of the same gross receipts.

From this the conclusion is drawn that each dollar earned by the company costs in operating expenses 30.85 cents for conducting transportation, and 31.37 cents for other expenses. If the cost of conducting local freight transportation in Nevada is twice the cost of conducting transportation of the company business as a whole, the total operating expense will be 31.37+30.85+30.85, or 93.07 per cent. of the entire receipts of intrastate or local traffic. If the cost is three times the cost of the whole business, the 30.85 must be added three times, and the operating expenses for Nevada intrastate business will be 31.37+30.85+30.85+30.85 or 123.92 per cent. of the gross receipts. Hence, in order to earn each dollar of revenue for intrastate freight, the company must pay an expense of 93.07 cents, or a total of $148,-717.86, on a 2 to 1 basis. On a 3 to 1 basis it must pay in expense to earn each dollar of its freight revenue 123.92 cents, or a total of $198,013.49; and thus, on the 3 to 1 basis, expenses exceed receipts by 23.92 per cent.

These results are shown in table 7. The tables are constructed on the assumption that the company hauled, in round numbers, 3½ million tons of freight for $159,791.40 that the expense was 123.92 per cent. of the receipts, or $198,013.49, and the loss $38,222.09.

"Obviously," says Justice Brewer in Ames v. Union Pac. Ry. Co. (C. C.) 64 Fed. 165, 182, "the cost of transportation would be the same whether the companies received the prices which they in fact did receive, or the reduced rates prescribed by house roll 33."

This statement seems too clear to require demonstration or the support of authority; and it is equally clear that the cost of transportation would be the same whether the rates and the resulting gross income be increased or decreased. The mere fact that a man receives $20 rather than $10 for performing a service cannot increase his expenses.

Mr. Seger says the amount collected for moving intrastate freight during 1907 was $159,791.40, but "on the same business for the same period and under the same circumstances the amount collectible * * * if * * * the act in controversy had been the law would have been $103,042.05."

Let us assume that the act was in force, and that the company received but $103,042.05, instead of $159,791.40, for hauling the 3,564,-462 tons of local freight. On a 3 to 1 basis the expense was 123.92 per cent. of $103,042.05, or $127,689.70 instead of $198,013.49; and the loss $24,647.65, instead of $38,222.09.

Again, if we assume that the company receives but $10,000 instead of $159,791.40 for hauling 3,564,462 tons, the expense will be 123.92

per cent. of the receipts, or $12,392, and the loss but $2,392, instead of $38,222.09.

Again, if we assume that the company received a million dollars instead of $159,791.40 for hauling 3,564,462 tons, the expense will be 123.92 per cent. of the gross receipts, or $1,239,200; and the loss $239,200, instead of $38,222.09.

These results are shown in the following table:

| Tons Intrastate Freight Moved One Mile. | Gross Receipts on Local Tonnage. | Percentage of Expenses to Earnings— Basis 3 to 1. | Cost of Hauling Local Freight. | Net Loss for Local Freight. |
|---|---|---|---|---|
| 3,564,462 | $159,791.40 | 123.92 | $198,013.49 | $38,222.09 |
| 3,564,462 | 103,042.05 | 123.92 | 127,689.70 | 24,647.65 |
| 3,564,462 | 10,000.00 | 123.92 | 12,392.00 | 2,392.00 |
| 3,564,462 | 1,000,000.00 | 123.92 | 1,239,200.00 | 239,200.00 |

Instead of being the same in each case, the expense for transporting the given amount of freight varies from $12,392 to $1,239,200. Under this method of computation it would seem that a raise in the rates will be followed by a larger expense and greater loss. The company cannot, if its formula be correct, reduce its losses by raising its rates and increasing its income from local traffic. So long as it costs 123.92 cents in expense for every dollar of income, the expense will increase faster than the earnings. The condition is not nearly so good as that of a rear-end lantern racing with the headlight. A rule for computing profit and loss which leads under varying conditions to such startling results cannot be correct.

Without attempting here to give an equivalent expression in tons hauled one mile for the service performed in order to earn one dollar at an expense of 62.22 cents, let it be assumed for the purpose of illustration that the service is the same as in Nevada, where the company in 1907 hauled 746,414,832 tons one mile for $8,253,564.33, or approximately 90 tons for one dollar. The complete statement then would be that, as an average, the company hauled 90 tons one mile for one dollar, and at an expense of 62.22 cents. The expense, however, is in carrying the freight, not in manipulating the dollar. Now, if 90 tons of local freight are carried at an expense, on the 3 to 1 basis, of 123.92 cents, there will certainly be a loss of 23.92 cents for every dollar earned, provided the company continues to hold its rates at one dollar for transporting 90 tons one mile; but it appears from the testimony, in 1907 the company hauled 3,564,462 tons one mile for $159,791.40, or 22.3 tons for $1, or at the rate of 90 tons for about $4. If the company carries 90 tons one mile at a cost of 123.92 cents, and receives therefor a compensation of $4 instead of $1, there will certainly be a substantial profit above expense.

7. It will be observed that Mr. Seger and Mr. Calvin testify as to a ratio of 3 to 1, not between intrastate and general freight traffic, but between the cost of conducting local freight business in Nevada and the cost of conducting the business of the Southern Pacific Company as a whole. The additional cost is not affirmed of operating expenses

generally, but is limited to the conduct of transportation. There is no testimony to the effect that other operating expenses, such as maintenance of way and maintenance of structures and equipment, are greater for Nevada intrastate freight than for Nevada freight in general. True, Mr. Seger's tables Nos. 1 and 7 show that such other expenses for the whole system are 31.37 per cent. of the gross receipts, and this rate is applied to the entire earnings, $159,791.40, accruing from domestic freight traffic, in order to ascertain the expense for maintenance of way, etc. But Mr. Seger's table No. 6 shows that all operating expenses for Nevada freight traffic (excluding the cost of conducting transportation) are but 17.13 per cent. of the entire freight earnings for Nevada. The difference between 31.37 per cent. and 17.13 per cent. of $159,791.40 is more than $22,000. Conceding complainant's method of computation to be correct, this is an excessive charge against intrastate freight. The evidence shows that the expense for maintenance of way and structures in Nevada is fixed on a basis of actual expenditure, and the expense for maintenance of equipment is apportioned to Nevada on a basis of revenue engine mileage for engines, and car mileage for cars. Eliminating the cost of conducting transportation, there is no evidence which shows that operating expenses are higher for intrastate than for Nevada freight traffic in general.

For the purpose of computing the cost of conducting local freight transportation, the witnesses have given us as a standard the cost, not of conducting freight transportation, but the cost of conducting all kinds of transportation, not in Nevada, but on the whole system; that is, the cost of conducting mail transportation, express transportation, passenger transportation, and freight transportation. The total cost of conducting transportation on the whole system, in round numbers, is $25,000,000. If we could ascertain the average expense of conducting transportation for all sorts of freight, local freight, through freight, freight in train load lots and in small parcels, as being some definite sum for hauling one ton one mile, on a ratio of 3 to 1 between the cost of intrastate freight and freight in general, we could easily compute the approximate cost of moving the Nevada intrastate freight, because we know the precise number of tons moved one mile. But the fact that it costs $25,000,000 to conduct all sorts of transportation gives no unit of service for comparison. We know how many times to apply our measuring stick, but we do not know the length of the stick.

Our problem is something like this: If it costs $25,000,000 to transport freight, passengers, mail, and express, how much will it cost to transport 3,000,000 tons of freight one mile? Or, if it costs $100 to cut a quantity of cordwood and saw logs, how much will it cost to cut five cords of mahogany?

Complainant meets this difficulty by ascertaining the average cost of conducting transportation for each dollar of gross income (that is, the income from all sources, such as mail, express, rents, freight, and passenger service) to be 30.85 cents. Thus, according to complainant's estimate, each dollar of gross income costs 30.85 cents for conducting transportation in general. What, then, is the equivalent for this estimate, expressed as the cost of hauling one ton one mile?

It appears from table 4 that the gross freight earnings of the entire system were $52,313,267.39, and the total expense for conducting freight transportation $15,989,410.43, or 30.56 per cent. of the gross freight earnings. The cost per unit for conducting all transportation is to the cost per unit of conducting all freight transportation as 30.85 to 30.56. In other words, the average cost of conducting all transportation is 1.0095 times greater than the average cost of conducting freight transportation. If, then, we ascertain the average cost on the whole system of hauling one ton of freight·one mile, and multiply the result by 1.0095, we shall have approximately the cost of hauling one ton of freight one mile, which is required as the basis or standard of complainant's ratio. Multiplying this result by three to conform .to complainant's ratio of 3 to 1, we shall have approximately the cost of conducting intrastate freight transportation in Nevada for carrying one ton a distance of one mile.

It appears from the testimony of W. H. Hathaway, chief clerk of the auditor of freight accounts of the Southern Pacific Company, that during the fiscal year 1907 the Southern Pacific Company carried on the entire Southern Pacific System 4,290,621,056 tons of freight one mile at a cost for conducting transportation of $15,989,410.43. Dividing the cost by the number of tons moved, the result is 0.3726595+, or a little more than one-third of one cent. This is the average cost of conducting freight transportation on the whole system per ton mile. Multiplying this cost by 1.0095 we obtain an expression which is equivalent to the cost for conducting all kinds of transportation on the whole system, namely, 0.37619+ of one cent. Multiplying this by 3 to conform to the 3 to 1 ratio, we have 1.1286— cents, or the cost per ton mile for conducting intrastate freight.

The evidence is that in 1907 the Southern Pacific Company transported 3,564,462 tons of intrastate freight in Nevada one mile. Multiplying the tons thus moved by the cost of moving one ton one mile, the result is $40,228.50, or the total cost of conducting Nevada intrastate freight transportation.

We have next to ascertain the cost of maintenance of way, structures, and equipment, and of general expense. This, as we have seen, should be no greater for intrastate freight than for general freight traffic in Nevada. It appears that the total receipts from Nevada freight transportation in 1907 were $8,253,564.33, and the total number of tons moved one mile was 746,414,832. Of this tonnage 3,564,462 tons were intrastate or domestic freight, on which the total earnings were $159,791.40. If the maximum rates provided in the act of 1907 had been in force during that year, the reduction of income in consequence would have been $56,749.35.

The total expense for moving all Nevada freight in 1907, according to table 6 attached to Mr. Seger's affidavit, is apportioned as follows:

Conducting transportation.............................................$1,768,492 22
Maintenance of way..............................$413,486 36
Maintenance of equipment........................ 860,474 29
General expenses................................ 149,292 78   $1,423,253 43

Total expense for moving all freight, to wit, 746,414,832
    tons ...........................................................$3,191,745 65

Dividing $1,423,253.43, total expense for maintenance of way, etc., by 746,414,832, the number of tons moved one mile, the result will be 0.19067+ of one cent per ton mile. Multiplying this by 3,564,462, the number of tons of intrastate freight hauled one mile, the product will be the total cost for maintenance of way, etc., or $6,796.64.

These results may be summarized as follows:

| | | |
|---|---|---|
| Total receipts for hauling intrastate freight in Nevada in 1907....$159,791 40 | | |
| Reduction if maximum rates of the railroad commission law had been in force in 1907...................................... | 56,749 35 | |
| Total receipts under reduced rates.......................$103,042 05 | | |
| Conducting transportation..........................$40,228 50 | | |
| Other expenses..................................... | 6,796 64 | |
| Taxes ............................................. | 2,296 64 | $ 49,321 78 |
| Net balance after paying operating expenses and taxes.....$ 53,720 27 | | |
| Deducting interest................................... | 18,222 01 | |
| Balance available for dividends on $333,923.88 capital stock (10.6+%) ................................................$ 35,498 26 | | |

If the indebtedness is disregarded, $53,720.27, the residue after paying taxes and operating expenses, will yield an income of 6+ per cent. on $881,763.67, the proportionate value of the property used in intrastate freight traffic.

In allotting to intrastate freight traffic its portion of the taxes, interest, stock, and value of property, I have taken the ratio between the entire gross earnings of the company in Nevada and the gross domestic freight income; that is, between $12,005,443.23 and $159,-791.40. But the above results have been computed on the theory that the total income available for the payment of operating expenses, taxes, income, and interest is $103,042.05, instead of $159,791.40.

It may well be urged that the correct ratio is to be obtained by dividing $103,042.05 by $11,948,693.88. In that case intrastate freight may be charged with .8657+ per cent. of $66,253,187.21, or $573,-567.09, the value of the property; .8657+ per cent. of $172,562.89, or $1,493.91, for taxes; .8657+ per cent. of $1,369,149.88, or $11,853, for interest; and .8657+ per cent. of $25,090,080.50, or $217,209.84, for capital stock.

The results would then be summarized as follows:

| | | |
|---|---|---|
| Total receipts from domestic freight...........................$159,791 40 | | |
| Reduction from maximum rates.................................. | 56,749 35 | |
| Total income under reduced rates.......................$103,042 05 | | |
| Conducting transportation..........................$40,228 50 | | |
| Other expenses..................................... | 6,796 64 | |
| Taxes ............................................. | 1,493 91 | $ 48,519 05 |
| Net balance after paying operating expenses and taxes.....$ 54,523 00 | | |
| Deducting interest...................................$ 11,853 00 | | |
| | | $ 42,670 00 |

This balance will yield an income of 19.6 per cent. on $217,209.84 capital stock. If the bonded indebtedness is disregarded, the net

balance, $54,523, above operating expenses and taxes, will yield an income of 9½ per cent. on $573,567.09 of the value of the Central Pacific Railway Company's property in Nevada.

The total operating expenses for conducting transportation, maintenance of way and structures, maintenance of equipment and general expense, was $40,228.50 plus $6,796.64, or $47,025.14.

Now the total amount of freight moved one mile by the Southern Pacific Company in Nevada during 1907 was 746,414,832 tons, and of this but 3,564,462 tons was intrastate freight. Therefore, the intrastate or domestic freight was but .47754+ of 1 per cent. of the total amount of freight; that is, the intrastate freight was less than one-half of 1 per cent. of all the freight transported by the company in Nevada. If the cost of conducting transportation were no greater for intrastate freight than for freight in general, the total expense of moving the intrastate freight would be .47754+ of 1 per cent. of $3,191,745.65, the expense of moving all freight, or $15,242, as against $47,025.14, which is allowed.

If $8,253,564.33, the total receipts from Nevada freight traffic, is divided by 746,414,832, the number of tons moved one mile, the result will be 1.10576+ cents, or the general average amount received by the company for hauling one ton of freight one mile.

If $159,791.40, total earnings from Nevada intrastate freight, be divided by 3,564,462, the total number of tons of intrastate freight moved one mile, we shall have 4.4829+ cents, or the average amount received by the company for hauling one ton of intrastate freight one mile, as against 1.10576+ cents, the average amount received by the company per ton mile for hauling Nevada freight in general.

It is obvious from these results that the charge for hauling intrastate freight is more than four times as large as the average charge for hauling freight generally.

I cannot hold that such a return on the property used in conducting Nevada intrastate freight traffic is confiscatory.

### Nevada & California Railway Company.

8. The undisputed testimony shows that the total issued capital stock of the company amounts to $4,837,000. The proportionate amount thereof allotted to Nevada on a mileage basis is $3,265,543. This last amount will be distributed to the intrastate traffic of the company in the ratio which its total Nevada earnings, $1,820,766.79, bear to $250,-079.71, its total earnings from Nevada intrastate freight, or 13.7348+ per cent. 13.7348+ per cent. of $3,265,543 is $448,515.80, the capital stock of the company allotted to intrastate freight.

The total funded debt of the company is $2,000,000, on which the annual interest charge is $80,000; the proportionate amount of debt allotted to intrastate freight is $184,887.09, on which the annual interest is $7,395.42.

The total cost of the entire line of the Nevada & California Railway to June 30, 1907, was $6,544,911.32, of which the proportionate amount allotted to Nevada on a mileage basis is $4,405,061.20, and to Nevada

intrastate freight traffic $605,026.31. The taxes paid by the company on its Nevada property in 1907 amounted to $47,649.56. Of this amount the intrastate traffic will be charged with 13.7348+ per cent., or $6,542.28.

In this case it is shown that the intrastate freight business of the Nevada & California Railway Company is more expensive than the business of the company as a whole, in the proportion of 3 to 1; the ratio, however, applies only to so much of the expense of operation as relates to the cost of conducting transportation.

The gross earnings of the entire line for 1907 were $1,977,734.16; and the entire cost of conducting transportation for the business as a whole was $397,980.49, or 20.123+ per cent. of the gross earnings. The gross freight earnings for the entire line were $1,412,292.04, and the entire cost of conducting transportation for the entire freight business of the company was $298,808.22, or 21.1576+ per cent. of the gross freight earnings.

In the management of the entire business of the company each dollar of income cost 20.123 cents for conducting transportation. In the management of the entire freight business of the company each dollar of income cost 21.1576 cents for conducting transportation. The cost per unit for conducting all transportation is to the cost per unit for conducting all freight transportation as 20.123 is to 21.1576. Otherwise expressed, the average cost of conducting all transportation is .95 times the average cost of conducting freight transportation.

During the year 1907 the company transported, all told, on its entire line 53,637,779 tons of freight one mile at a cost for conducting transportation of $298,808.22. Dividing the cost by the number of tons, the result is .55708+ of one cent, or the average cost per ton mile for conducting all freight transportation. Multiplying this by .95, the result will be approximately the equivalent of the cost per unit of conducting all kinds of transportation expressed in cost per ton mile for conducting freight transportation on the entire line of the Nevada & California Railway, namely .529226+ of one cent. Multiplying this by 3 in order to conform to the 3 to 1 ratio, we have 1.58768 cents, or the cost per ton mile for conducting intrastate freight transportation.

The company in 1907 moved 7,151,303 tons of intrastate freight one mile. Multiplying the number of tons by the cost of moving one ton one mile, the result is $113,539.80, or the cost for conducting transportation of intrastate freight.

Operating expenses for maintenance of way and structures, maintenance of equipment and general expense, are not shown to be greater for intrastate freight than for freight in general. In 1907 the total number of tons moved one mile in Nevada was 51,590,165, of which 7,151,303 were intrastate freight. The total earnings were $1,317,-302.37, of which $250,079.71 were the earnings from intrastate freight. If the maximum rates of the statute had been in force during that year, the intrastate freight earnings would have been reduced by the sum of $98,586.04.

The total expense of moving all Nevada freight is apportioned as follows:

Conducting transportation.....................................$244,566 13 .
Maintenance of way................................$125,316 55
Maintenance of equipment......................... 86,480 07
General expense.................................. 18,183 02   $229,979 64

Total operating expense for all Nevada freight, 51,590,165
    tons ...............................................$474,545 77

Dividing the total expense for maintenance of way, etc., $229,979.64, by 51,590,165, the number of tons moved one mile, the result is .4457+ of one cent per ton mile. Multiplying 7,151,303, the number of tons of intrastate freight moved, by .4457+ of one cent, the cost per ton mile, we have $31,873.35, expense of intrastate freight for maintenance of way, etc.

These results may be summarized as follows:

Total receipts for hauling intrastate freight.....................$250,079 71
Reduction if maximum rates had been in force................... 98,586 04

Total receipts under reduced rates.......................$151,493 67
Conducting transportation.........................$113,539 80
Maintenance of way, etc........................... 31,873 35
Taxes ........................................ 6,542 28   $151,955 43

Excess of expense and taxes over income.................$    461 76

Operating expenses, including taxes, exceed the income which could have been received under the maximum rates by $461.76. Thus there is nothing left for interest or for dividends on the stock.

In Spring Valley Waterworks v. San Francisco (C. C.) 124 Fed. 574, Judge Morrow held that water rates fixed by a municipal ordinance which yielded but 4.40 per cent. return on the reasonable value of the property employed in supplying the San Francisco with water, were confiscatory. Judge Gilbert, in a subsequent case between the same parties ([C. C.] 165 Fed. 657, 666), held that rates fixed by a municipal ordinance which yielded less than 4.4 per cent. on the investment were confiscatory.

On the undisputed facts of this case, and evidence which was introduced without objection and without contradiction, the maximum rates, if enforced, would result in confiscating the use of complainant's property.

### San Pedro, Los Angeles & Salt Lake Railroad Company.

9. In this suit defendants contend that the court is without jurisdiction because the amount in controversy is less than $2,000. It appears from the evidence that had the maximum rates in question been in force in 1906 and 1907 the company would have suffered a loss of $441 for the first year and $779.97 for the 11 months of the second year. This contention is without merit. Jurisdictional facts were sufficiently set out in the bill. These averments were not met by any plea to the jurisdiction, nor were they in any manner denied in the answer. The federal statute declares that in certain classes of actions the Circuit Courts of the United States shall have jurisdiction con-

current with state courts where the matter in dispute, exclusive of interest and costs, exceeds the sum of $2,000. The amount in dispute for jurisdictional purposes in a suit for injunction is the value of the right to be protected, not the amount of the alleged or anticipated loss. No loss has yet accrued, because the maximum rates in question have never been enforced. It certainly cannot be the rule that one whose rights are threatened with irreparable injury must wait until he has suffered actual damage to the extent of more than $2,000 before a Circuit Court can entertain his petition for injunctive relief.

It is not claimed that defendants have taken complainant's property, or that they will or have deprived it of the ownership or possession of the railroad. The complaint is that defendants threaten to enforce certain rates, and, if they do, complainant's income will be reduced below that fair, just, and reasonable return for the use of its property which is protected by the Constitution. The right to a just and reasonable return on the fair value of its property devoted to intrastate traffic in Nevada is property. Unlawful invasion of that right may be restrained by this court in a proper case where the value of the right, exclusive of interest and costs, exceeds $2,000. The bill alleges, and the testimony tends to show, the requisite value. Whether the right will be violated by the maximum rates, if enforced, is another question. Smith v. Bivens (C. C.) 56 Fed. 352; Butchers' & Drovers' Co. v. Louisville & N. R. Co., 67 Fed. 35, 40, 14 C. C. A. 290; Nashville, etc., Ry. Co. v. McConnell (C. C.) 82 Fed. 65, 72; Board of Trade v. Cella Com. Co., 145 Fed. 28, 76 C. C. A. 28; McNeill v. So. Ry. Co., 202 U. S. 543, 558, 26 Sup. Ct. 722, 50 L. Ed. 1142.

The San Pedro Railroad runs across the southern portion of the state for a distance of 210.87 miles, through a sparsely settled, unproductive country. July 1, 1907, the interest-bearing debt of the company was $42,650,000. The proportionate amount allotted to the Nevada mileage is $9,559,571, on which the annual interest charge is $394,262.26. The interest chargeable to Nevada intrastate freight apportioned according to gross receipts is $1,186.73.

·The entire line of road cost $64,712,410.58, of which the amount allotted to Nevada on a mileage basis, including equipment, is $14,504,-639.71. Of this, on a basis of earnings, $43,658.96 is chargeable to Nevada intrastate freight.

The road was opened in May, 1905. During the 11 months ending May 31, 1907, the company handled but 898 tons of intrastate freight; this was carried an average of 62.73 miles, making 56,233 ton miles all told, for a compensation of $3,733.49. There were 891 different shipments of less than car load lots, and 39 full car loads of freight.

Under these conditions carrying intrastate freight must be more expensive than carrying through freight, but to ascertain a ratio from the evidence which can be applied is not easy.

General Manager Wells says that:

"The actual cost of the station service and of the labor involved in the local traffic upon complainant's railroad in the state of Nevada is not less than ten times as great per unit of traffic as in the case of the through business. In this estimate I am considering only the actual cost of transportation, and am not considering any charges to be made in respect of such traffic for

the items properly chargeable as maintenance of way, or general expenses or taxes, nor yet anything in respect of return upon the value of the company's railroad, but have reference only to the various conditions concerning the cost of handling, moving, receiving, and delivering freight upon this company's line of railroad."

Again, he says:

"The actual cost of carriage of the business done by said railroad locally in the state of Nevada is not less than ten times the per unit of the interstate business of said company in the state of Nevada."

General Traffic Manager Wann says:

"The local business costs relatively not less than ten times the general average cost of the entire business of the entire line of road per unit of traffic."

The record does not disclose the unit of traffic for the entire business of the entire line of road for the 11 months ending May 31st, nor does it afford sufficient data from which we can ascertain in terms of such a unit the cost during those 11 months of moving freight.

Mr. Wells' statements are not sufficiently definite to designate precisely the two elements which stand in the ratio of 10 to 1, so that we may ascertain the value of either of them. He does not give the cost of interstate business nor of through business per unit of traffic, nor do such values appear in the record.

Let us assume that the cost of conducting transportation for intrastate freight is ten times as great as for Nevada freight in general. During the 11 months ending May 31, 1907, the company carried 52,525,370 tons of freight one mile at a cost for conducting transportation of $202,071.33, or .3847+ of one cent per ton mile. The total cost for maintenance of way and structures, maintenance of equipment, and general expense for the same tonnage and during the same period was, $279,563.98, or .53224+ of one cent per ton mile. Therefore the average cost of moving one ton of Nevada freight one mile is: For conducting transportation, .3847 cents; for maintenance of way, etc., .53224 cents—total, .91694 cents.

If we apply the 10 to 1 ratio to the cost of conducting transportation, we shall have: Conducting transportation (.3847×10), 3.847 cents; maintenance of way, etc., .53224 cents—total, 4.37924 cents.

This result is the cost of moving one ton of intrastate freight one mile. If it costs 4.37924+ cents to move one ton of local freight one mile, moving 56,233 tons one mile will cost $2,462.57. For transporting this freight the company received 6.62 cents per ton mile, or a total of $3,733.49. Had the maximum rates been enforced, the reduction would have been $779.97, leaving a balance of $2,953.52, and a profit of $490.95 above expenses. This profit is 16.6 per cent. of the intrastate freight receipts under the maximum rates. During the same period the total receipts of the company from all sources for all Nevada business were $982,028.47; operating expenses were $901,903.17— leaving a profit above operating expenses of $80,125.30, or but 8.1 per cent. of the gross receipts, as against 16.6 per cent. for intrastate freight. At the ratio of 10 to 1 operating expenses for domestic freight per ton mile were 4.37924+ cents, as against the average

expense per ton mile of .91694 of one cent for all freight on the same road in Nevada. The expense per ton mile for intrastate freight transportation on the Southern Pacific Company in 1907 was 1.31+ cents, and on the Nevada & California Railway 2.033+ cents. It is true the net income above operating expenses was not sufficient during the 11 months mentioned to pay that portion of the taxes and of the interest on the funded and floating debt which was properly chargeable to Nevada intrastate freight traffic. But this is also true of the company's Nevada business in general, the deficit for that business being $405,475.97. And it also appears that the total income of the company from its business in Utah, Nevada, and California as a whole was insufficient to pay operating expenses, taxes, and interest on the debt, the deficit being $313,825.93. It thus appears that neither the earnings of the company as a whole, nor the earnings of the Nevada business as a whole, nor the earnings of the Nevada intrastate freight traffic were sufficient to yield any return whatever for stockholders during the 11 months ending May 31, 1907. This condition of things does not necessarily lead to the conclusion that intrastate, interstate, or general charges were too low, nor, on the other hand, that the expenses were too high. The more reasonable inference is that the business of the company was small in comparison with its investment.

If we substitute the 3 to 1 ratio instead of the 10 to 1, the results will be as follows:

Total earnings.................................................$3,733 49
Reduction if maximum rates were enforced........................ 779 97

    Income under reduced rates...............................$2,953 52
Cost of conducting transportation (.3847 cents × 3 × 56,233
    tons) ................................................$648 98
Maintenance of way, etc. (.53224 cents × 56,233 tons)...... 299 29
Taxes apportioned on basis of earnings.................... 132 35  $1,080 62

    Balance above expenses and taxes.........................$1,872 90
Interest apportioned on basis of earnings......................$1,186 73

    Net for stockholders.....................................$ 686 17

The cost of the road and equipment apportioned to Nevada on a mileage basis is $14,504,639.71, or $68,784.74 per mile, as against $19,842.61 per mile for the Nevada & California Railway Company, and $146,900 per mile for the Central Pacific Railway Company. The proportion of the cost of the road properly allotted to Nevada intrastate freight traffic on a basis of relative earnings is $43,658.96. On this amount, the net income of $1,872.90, after paying operating expense and taxes, is sufficient to pay a return of 4.28 per cent.

It does not necessarily follow that a schedule of maximum rates fixed by law is confiscatory because it fails to yield a reasonable return on the investment, above taxes, operating expense, and interest on the indebtedness. The rates must be reasonable to the company, but they must, in any event, be reasonable to the public. If a railroad is built into a new, sparsely settled territory with a view of serving a large future population and developing business, the Constitution does not require the few people and the small business of the present time to

pay rates which will yield an income equal to the full return to be
gathered when the country is populated and business developed to the
full capacity of the road. Beale & Wyman, R. R. Rate Reg. §§ 343,
344, 462; Capital City Gaslight Co. v. Des Moines (C. C.) 72 Fed.
829, 844; Boise City I. & L. Co. v. Clark, 131 Fed. 415, 65 C. C. A.
399; Water Dist. v. Water Co., 99 Me. 371, 376, 59 Atl. 537.

In San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 446, 23
Sup. Ct. 571, 574, 47 L. Ed. 892, Mr. Justice Holmes says:

"If a plant is built, as probably this was, for a larger area than it finds
itself able to supply, or, apart from that, if it does not, as yet, have the
customers contemplated, neither justice nor the Constitution requires that,
say, two-thirds of the contemplated number should pay a full return."

Under the evidence it cannot be held that the maximum rates if
applied as a whole to the intrastate freight traffic of this company
are confiscatory.

### Eureka & Palisade Railway Company.

10. The capital stock of this company is $300,000. The fair pres-
ent value of its property, according to the only witness who has testi-
fied on the subject, is $600,000. Its railroad is 88 miles in length, and
its total indebtedness is $30,343. The bulk of the business is interstate.

"The town of Eureka, which is the southern terminal of said road and
from which and from the terminus of the Ruby Hill branch all outward-bound
freight is shipped, and to which points all inward-bound freight is destined,
has a population of about a thousand. At one time it was prosperous owing
to the operation of the mines in that vicinity, but in later years mining has
materially decreased, leaving practically but one large producing company,
operating in the district, and from whom freightage to the amount of $46,929.-
76 out of a total freight earning of $81,629.06 is obtained.

"The ores so far shipped by said company are of low grade, and there is no
assurance that mining operations will be permanently continued in that dis-
trict unless ores may be hereafter exposed and uncovered; in other words, the
present operations of said company are largely experimental in the hope that
something may be discovered which will make the camp a permanent one.
There is practically no local freight between stations."

The earnings of the company for the fiscal year ending June 30,
1907, were as follows:

| | | |
|---|---|---|
| Passenger, mail and express service | $ 29,254 | 12 |
| Through ore | 36,292 | 15 |
| All other freight | 45,336 | 91 |
| Miscellaneous earnings | 1,817 | 46 |
| Total | $112,700 | 64 |

During the same period the expenses were as follows:

| | | | |
|---|---|---|---|
| Operation and maintenance | $103,415 41 | | |
| Taxes | 4,206 83 | $107,622 | 24 |
| Net income above taxes and operating expenses | | $ 5,708 | 40 |

This surplus must be applied to immediately maturing obligations.
No dividends have been paid since December 31, 1904. Under the
operation of the maximum rates, if applied, the net income of the
company would have been reduced $2,410.13. If we were considering

the effect of the maximum rates on the business of the company as an entirety, this showing would be exceedingly persuasive; but over the interstate business of the company, and consequently over the business of the company as a whole, the state has no control. The authority of the state to regulate freight rates is limited to that traffic which begins and ends within its borders.

"The reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from it. The state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the state has no control. Nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way to meet losses on its interstate business. So far as rates of transportation are concerned, domestic business should not be made to bear the losses on interstate business, nor the latter the losses on domestic business. It is only rates for the transportation of persons and property between points within the state that the state can prescribe: and when it undertakes to prescribe rates not to be exceeded by the carrier, it must do so with reference exclusively to what is just and reasonable, as between the carrier and the public, in respect of domestic business. The argument that a railroad line is an entirety; that its income goes into, and its expenses are provided for out of, a common fund; and that its capitalization is on its entire line, within and without the state can have no application where the state is without authority over rates on the entire line, and can only deal with local rates and make such regulations as are necessary to give just compensation on local business." Smyth v. Ames, 169 U. S. 466, 541, 18 Sup. Ct. 418, 432, 42 L. Ed. 819.

Whether the income of the company from that freight business which is wholly within the state will, by enforcement of the maximum rates, be unreasonably and unlawfully reduced, can only be determined by ascertaining whether the difference between domestic freight earnings and domestic freight expense is sufficient to pay a reasonable return on the fair proportion of the property devoted to and properly assignable to that class of traffic. Chicago, etc., Ry. Co. v. Tompkins, 176 U. S. 167, 177, 179, 20 Sup. Ct. 336, 44 L. Ed. 417.

"The method of procedure in such a case is to find what part of the gross receipts is derived from business within the state, and then find the actual cost of doing the business. This cannot be found by taking a proportionate part of the cost for the entire line, since the cost of moving local freight is greater than that of moving through freight." Beale & Wyman on R. R. Rate Reg. § 466.

Neither can it be found by applying the ratio between interstate and domestic earnings, because local charges are usually higher than other charges.

The facts in relation to the business of the company for the fiscal year ending June 30, 1907, are introduced to demonstrate the injustice of the maximum rates, not as applied to the whole business, nor as applied to the whole intrastate business, but only as applied to domestic freight traffic. No evidence so introduced shows the amount of domestic freight handled, the average distance it was hauled, the rates charged, the total compensation, or the operating expenses incurred in moving it. If we know neither the service performed, the compensation received, nor the expense incurred, how can we determine wheth-

170 F.—49

er lower rates and charges for transportation are reasonable or unreasonable? If the net income from domestic freight traffic is relatively large, that branch of the business may be profitable, though the business as a whole is very unprofitable. The facts are not given from which we may determine whether the charges are higher or lower, or whether the operating expenses are greater or less for intrastate freight than for other business of the company. State v. Atlantic Coast Line R. R. Co., 48 Fla. 146, 37 South. 657.

The testimony here is wholly insufficient to overcome the presumption in favor of the constitutionality of the act, and the reasonableness of the maximum rates therein set forth.

### Tonopah & Goldfield Railroad Company.

11. This road is 97.1 miles in length. The cost of construction and equipment was $3,503,954.06. The bonded indebtedness in round numbers is, $1,073,000. The capital stock issued and fully paid up is $2,150,000.

During the year ending June 30, 1907, the total earnings of the
company from all sources were.............................$2,380,943 41
Total operating expenses......................$1,287,133 27
Taxes ......................................... 44,012 97
Interest on bonds, etc........................ 66,683 67   $1,397,829 91

Net income above operating expenses, taxes and interest..$ 983,113 50

This was sufficient to pay to the holders of the $2,150,000 capital stock a dividend of 45.72 per cent.

The evidence shows that during the same year the company handled 139,746 tons of intrastate freight, of which all but 5,160 tons was in car load lots. Nothing is shown as to the average length of haul, either of intrastate or interstate freight. Neither are we informed as to the relative weight and number of freight shipments. Evidence as to light loading, short trains, frequent stops, short hauls, and shipments in less than car load quantities would show the greater expense of hauling local freight, but such testimony is wanting. No facts are given which prove for this road that it costs either more or less to handle domestic than to handle interstate traffic.

The total freight earnings were $1,736,827.77, of which $1,378,-728.39 is credited to interstate, and $358,099.38 to intrastate, business. If the maximum rates of the railroad commission act had been in force, the effect would have been a reduction of $199,124.74, leaving a gross income from domestic freight of but $158,974.64, instead of $358,099.38. This is a very serious reduction, but, standing alone, it is not sufficient to demonstrate its own unreasonableness. The evidence fails to tell how far complainant hauled it. 139,746 tons of intrastate freight. If the company hauls 139,746 tons an average distance of 22.75 miles for a compensation of $159,974.64, the average charge per ton mile is 5 cents, which ordinarily would be a generous rate. If the average haul is 45.5 miles, the average charge is 2½ cents. (The average revenue per ton mile for the previous year in the whole United States was but .748 of one cent per ton mile.) It is impossible to affirm of such an income that it is unreasonable.

The total expense for all freight traffic during the year ending June 30, 1907, was $802,318.95, but how this should be apportioned as between intrastate and interstate business is a question upon which the evidence throws no clear light. As between interstate and domestic freight we have the relative earnings and tonnage shipped, but we know nothing of the relative number of tons carried one mile, the relative length of average haul, or the relative charge per ton mile.

In the calculations presented it has been assumed that operating expenses should be divided between the two classes, of business in proportion to their respective earnings; but as the respective charges for service are not shown to be the same, such an apportionment might lead to very inequitable results. For illustration: Suppose the company carries on the same train from Tonopah to Mina 200 tons of ore consigned to Virginia City and 200 tons consigned to California, it is difficult to conceive any reason why the expense to the company should be greater in one case than in the other. If the company charges twice as much per ton mile for hauling the Virginia ore as for hauling the California ore, this fact cannot of itself increase or diminish the cost incurred by the company in carrying the ores, nor justify any inference that the expense for conducting transportation, and for maintenance of way, etc., was larger per ton mile for one than for the other. If the company collected $400 on the ore for Virginia City, and $200 on the ore for California, it would not be correct for the purposes of this suit to apportion the company's expense for transportation in the proportion of two to one. The burden is on complainant to show that the reductions contemplated by the act will deprive it of a reasonable income from its property, and until this is done clearly and definitely there is no sufficient cause to declare the maximum rates confiscatory or illegal.

## Virginia & Truckee Railway Company.

12. This railroad is 52.2 miles in length, while its termini, Reno and Virginia City, are but 21 miles apart. The fair cost of reproducing the property is approximately $1,500,000, though the total cost of the road and equipment to June 30, 1907, was $4,920,119.07. During the year ending on that date the company carried 39,139 tons of interstate freight, upon which the revenue received was $27,314.22. During the same time it carried 67,085 tons of intrastate freight, upon which the revenue collected was $133,547.26. If the maximum rates of the railroad commission act are applied, the result is a reduction "in total freight earnings" of $60,868.82, and the net income on the main line of the railroad from all sources, passenger, freight, mail, and express, after deducting operating expense and taxes, is $22,-867.14, or an income of 1½ per cent. on the probable present value of the road. If the maximum rates are applied with "the most liberal application" of the statutory provision that "all hauls of less than 50 miles may be charged as if actually hauled 50 miles," the reduction will be $20,894.12, leaving, after deducting operating expense and taxes, a total net income on the main line of the road from all earnings, mail, passenger, express, and freight, of $62,841.75, or a net return of 4.18+ per cent. on $1,500,000.

It is quite possible, if the maximum rates are enforced on the Virginia & Truckee Railway, its net income from intrastate freight will be reduced to an unjust and unreasonable figure, but the evidence is insufficient to establish that fact. No data is given from which it is possible to discover the cost of transporting intrastate freight, either as a whole or per unit of traffic, consequently it is impossible to say with that certainty which the law demands whether the maximum rates as applied to the domestic freight business of this company are reasonable or unreasonable.

13. In the first clause of the seventh section of the railroad commission act the commission is commanded to adopt that classification of freight commonly known as "Western Classification No. 41," and it is declared that this classification "shall be uniform upon all railroads in this state," but when the schedule of maximum freight rates is introduced into the same section of the same act, it is with the following words:

"The commission shall not fix a greater rate, nor shall it allow any broad or standard gauge road to charge a greater rate than that fixed for the following classifications."

The scheme of rates so fixed is followed in the same section by this provision:

"Nothing contained herein shall be construed as preventing the commission fixing a less rate than those mentioned."

The last clause of section 14 reads as follows:

"Nothing herein contained shall be construed as allowing the commission to increase the maximum rates fixed by this act."

Nowhere in the act are railroads required in direct terms to adopt the maximum rates. The injunctions and prohibitions which accompany the schedule are addressed directly to the commission, and but indirectly, if at all, to the railroads. The obvious purpose of the Legislature was to charge the commission with the duty of regulating rates, but along lines and within limits prescribed by the act. The commission must prevent railroads from exacting unreasonable charges, whether the charges so exacted exceed or fall short of the maximum rates. It was within the mind of the legislative body that rates might be less than the maxima, and still be unreasonable. Hence the rates set out in the statute were adopted, not as rates which must be put in force and must be adopted by the railroads themselves, but as establishing the limit beyond which the commission may not go in fixing rates. If it had been the intention of the Legislature that the maximum rates should at once go into effect, without action on the part of the commission, or that railroads must conform their charges to the statutory schedule, it would have said so in unmistakable terms. When it deals with rates and charges fixed by the commission, the Legislature speaks in language which cannot be misunderstood. The contrast is significant. Commission-made orders fixing rates become operative within a limited time. Railroads affected by such orders must conform their charges thereto, and every railroad company must file with the commission the schedule of its rates prevailing at the time of the passage of the act.

It must be noted that the commission is not vested with a general power to adopt and promulgate rates. The statute gives no such authority. When a complaint is laid before the commission showing that any rate or rates are "unreasonable or unjustly discriminatory," or when the commission believes that any rate or rates are "unreasonable or unjustly discriminatory," it may proceed to investigate the same; but before an investigation can be had, 10 days' notice of the time and place of hearing must be given to the railroad and to the complainants, if any there be. The parties shall be entitled to be heard, and shall have process to enforce attendance of witnesses.

"If upon such investigation the rate or rates * * * complained of shall be found to be unreasonable or unjustly discriminatory * * * the commission shall have power to fix and order substituted therefor such rate or rates, fares, charges * * * as it shall have determined to be just and reasonable, and which shall be charged, imposed and followed in the future."

Section 14 expressly makes it the duty of the commission to "determine and by order fix a reasonable rate, fare, charge * * * or a joint rate to be imposed, observed and followed in future in lieu of that found" upon such investigation to be "unreasonable or unjustly discriminatory." It is also made the duty of the commission to "cause a certified copy of each such order to be delivered to an officer or station agent of the railroad affected thereby." Such "order shall of its own force take effect and become operative thirty days after the service thereof," and "all railroads to which the order applies shall make such changes on their schedule on file as may be necessary to make the same conform to said order, and no change shall thereafter be made by any railroad in any such rates, fares or charges, or in any joint rate or rates, without the approval of the commission." If any railroad shall fail, neglect, or refuse to obey any lawful requirement or order made by the commission, it shall be subject to the penalties prescribed by law.

Provision is made whereby any railroad or other party interested, being dissatisfied with an order of the commission fixing a rate. may within 90 days begin suit in the district court of the proper district to vacate and set aside such order on the ground that the rate or rates therein fixed are unreasonable or unlawful. Provision is also made for an appeal from the judgment of the court.

It would seem from all this that the commission is vested with authority to fix rates only as the result of an investigation at which it shall have been found that the previous rates are unreasonable or unjustly discriminatory.

The procedure provided in the statute for investigating and thereafter regulating rates is adequate to reach and reduce every unreasonable charge or schedule of charges applied in Nevada to domestic freight transported by rail.

The Legislature, having provided a method for the regulation of rates, all other methods are excluded. 2 Lewis' Sutherland, Stat. Constr. § 572; Smith v. Stephens, 10 Wall. 321, 326, 19 L. Ed. 933; Thomason v. Ruggles, 69 Cal. 465, 11 Pac. 25.

The commission has no power to fix a schedule of rates by summary order without investigation. It is clothed with no authority to

fix rates except after due investigation, and after a finding that a previous rate or rates were unreasonable or unjustly discriminatory.

It is very earnestly contended that the powers thus delegated to the commission are judicial; that the investigation is a trial, and the result a judgment. Special emphasis is laid on the fact that the new rates promulgated by the order are thus established, not for railroads in general, but only for the particular railroad which has been investigated. It may occur under the operation of the act that the same rate will be lawful for one carrier and unlawful for another, without other justification than the mere circumstance that one railroad has been investigated and the other has not.

Section 1, art. 3, of the Constitution of Nevada, reads thus:

"The powers of the government of the state of Nevada shall be divided into three separate departments, the legislative, the executive and the judicial; and no persons charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others except in the cases herein expressly directed and permitted."

Section 1, art. 6, reads thus:

"The judicial power of this state shall be vested in a Supreme Court, district courts and in justices of the peace. The Legislature may also establish courts for municipal purposes only, in incorporated cities and towns."

It is argued that the judicial power of the state is thus completely distributed, and is now vested in the several courts named in the Constitution; that these courts constitute the judicial department, and the whole of the judicial department, of the state. Consequently the Legislature is powerless to endow the Railroad Commission with judicial authority, and the exercise of judicial functions by the commission trenches on the power of the judicial department.

This question is very elaborately discussed in Louisville & N. R. Co. v. McChord (C. C.) 103 Fed. 216. The Kentucky statute there involved, excluding the fact that the Kentucky commission is not guided by a schedule of maximum rates, is practically the same as that portion of the Nevada act which prescribes the method for establishing rates. The Kentucky statute authorizes the Railroad Commission to investigate rates complained of, or believed by the commission itself to be extortionate; it requires the railroad company to be notified of the time and place of the hearing, and of the nature of the matter to be investigated; it requires the commission to hear such statements, evidence, and argument of the parties as are deemed relevant, and if the company complained of is found guilty of extortion the commission may by order fix a just and reasonable rate. It must serve a copy of such order upon the railroad company affected thereby, and it is provided that 10 days later the order shall go into effect. Violations of the order subject the offending railroad to penalties specified in the act.

Under constitutional provisions similar to our own it was held that the judicial department of that state had been established, and that no judicial tribunals except those named in the Constitution could be lawfully set up in Kentucky, and that the Railroad Commission was not such a tribunal. Therefore a statute attempting to confer judicial

powers on that commission was unconstitutional. The court took the view that the Legislature had the power to delegate authority to fix rates generally, and, if the statute had conferred only such general authority on the commission, it would be the duty of the court to wait until the commission had acted, and then pass upon the reasonableness or unreasonableness of the rates so established. The court declared that the statute neither fixed general rates nor gave the commission the right to establish such rates; it simply empowered the commission to fix rates in those individual instances where, after due investigation and hearing, rates had been found to be extortionate, and when so fixed the new rates were not of general obligation, but were binding only on the particular carrier found guilty of extortion. Finally, on page 226 of 103 Fed., the court uses this language:

"The act violates the Constitution of the state, in attempting to confer upon the commission what are judicial powers and functions, to wit, the power, after complaint and notice given, to 'hear and determine' that the railroad has been 'guilty of extortion,' and, as a consequence, after that finding, to further decide that the freight rate of that road for similar services shall be a lower figure. These steps, as they apply only to individual instances, and are not a method of fixing rates generally, constitute the very essence of a judicial proceeding and judgment."

No legal principle is better established than the rule that the power to fix rates, if delegated by the Legislature to a Railroad Commission, is, in kind, a legislative function, and that courts of equity will not interfere in advance by injunction to control the exercise of such a power. Prentis v. Atlantic Coast Line Co., 211 U. S. 210, 29 Sup. Ct. 68, 53 L. Ed. ——; McChord v. Louisville & N. R. Co., 183 U. S. 483, 495, 22 Sup. Ct. 165, 46 L. Ed. 289; Southern Pacific Co. v. Bd. R. R. Com'rs (C. C.) 78 Fed. 236; Louisville & N. R. Co. v. Brown (C. C.) 123 Fed. 946, 948; Chicago, B. & Q. R. Co. v. Winnett (C. C. A.) 162 Fed. 242, 246; New Orleans Waterworks Co. v. New Orleans, 164 U. S. 471, 482, 17 Sup. Ct. 161, 41 L. Ed. 518.

The fixing of rates is a legislative rather than a judicial act. This is true even though the order fixing a rate was preceded by the most searching investigation, whether conducted under judicial forms or not. It is the essential nature of an act rather than the method of its accomplishment which determines its character. If legislative proceedings and investigations culminating in the enactment of a statute were conducted in strict obedience to the rules which obtain in a court of law, it could not be claimed for an instant that a statute so adopted has the force and effect of a judgment. The distinction between the two functions is thus stated by Mr. Justice Holmes in Prentis v. Atlantic Coast Line Co., supra:

"A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind." Interstate Com. Com. v. Ry. Co., 167 U. S. 479, 505, 17 Sup. Ct. 896, 42 L. Ed. 243; Western Union Tel. Co. v. Myatt (C. C.) 98 Fed. 335, 341; Winchester, etc., R. R. Co. v. Commonwealth, 106 Va. 264, 281, 55 S. E. 692; Sawyer v. Dooley, 21 Nev. 390, 396, 32 Pac. 437; Steen-

erson v. Great Northern Ry., 69 Minn. 353, 376, 72 N. W. 713; Louisville & N. R. Co. v. Brown (C. C.) 123 Fed. 946, 948.

Ordinances adopted by legislative bodies fixing particular rates for individual public service corporations have been repeatedly upheld. Houston & T. C. R. Co. v. Storey (C. C.) 149 Fed. 499, 504; Home Telephone & Telegraph Co. v. City of Los Angeles (C. C.) 155 Fed. 554, 580; Covington, etc., Turnpike Co. v. Sandford, 164 U. S. 578, 598, 17 Sup. Ct. 198, 41 L. Ed. 560.

In the last case the General Assembly of Kentucky by statute had prescribed maximum rates to be collected on a turnpike road. The court uses this language:

"Justice to the public and to stockholders may require, in respect to one road, rates different from those prescribed for other roads. Rates on one road may be reasonable and just to all concerned, while the same rates would be exorbitant on another road. The utmost that any corporation, operating a public highway, can rightfully demand at the hands of the Legislature when exerting its general powers is that it receive what, under all the circumstances, is such compensation for the use of its property as will be just both to it and to the public."

Whether a rate fixed by the commission be a general rate applicable to all carriers in the state, or a single rate to be enforced against some individual railroad, the nature of the act is the same; it is not a declaration of rights as they stand under present or past fact and law, but it is the making and the promulgation of a new rule for the future—an act legislative, not judicial.

If the adoption of a particular rate for an individual road in the manner provided by the Kentucky statute is a legislative and not a judicial act, the question naturally arises, is it not the duty of the court, just as in the case of a general rate, to wait until the commission has acted, before passing on the reasonableness or unreasonableness of the rate?

When the McChord Case was taken to the Supreme Court of the United States (183 U. S. 483, 22 Sup. Ct. 165, 46 L. Ed. 289), after stating that the "fixing of rates is essentially legislative in its character, and the general rule is that legislative action cannot be interfered with by injunction," the court declared that under the General Statutes of Kentucky indictments for extortion, discrimination, and preference could be found against a railroad only on recommendation or request of the Railroad Commission. Consequently the court held that the duty of enforcing such rates as might be established by the Kentucky Railroad Commission under the act devolved upon the commission itself, and therefore an injunction restraining the Railroad Commission from action could not be had in a suit by railroad companies, brought before any rates were fixed by the commission. Accordingly the decree of the lower court was reversed, and the bills of complaint ordered dismissed.

These questions were again considered by the Supreme Court in Prentis v. Atlantic Coast Line Co., supra. An order of the State Corporation Commission of the state of Virginia fixing various passenger rates for the several railroads of that state was an issue. The order fixing passenger rates was made after due notice and hearing,

and it was at this stage of the proceedings that the railroad companies brought suit and obtained from a federal court an injunction restraining the commission from enforcing the new rates. The Constitution of Virginia clothes the Corporation Commission of that state with both judicial and legislative power. The commission may, after due notice, establish rates, and it may enforce them by its own appropriate process. Any aggrieved party may appeal to the Circuit Court of Appeals, and that court, if it reverses what has been done, may substitute such order or rate as in its judgment the commission should have made. Thus the Court of Appeals also is invested with rate-making power.

The Supreme Court said that the rates fixed by the commission, or substitute rates made by the Court of Appeals, notwithstanding the judicial character of the two bodies, were legislative acts, and that:

"No rate is irrevocably fixed by the state until the matter has been laid before the body having the last word. It may be that that body will adhere to the old rate, or will establish one that will not be open to the charge of violating the contracts alleged. * * * On the question of contract, as on that of confiscation, it is reasonable and proper that the evidence should be laid, in the first instance, before the body having the last legislative word."

It was therefore held that a suit to restrain the enforcement of a passenger rate fixed by order of the Corporation Commission was prematurely brought, if commenced before the rate had been finally considered and acted on by the Circuit Court of Appeals.

"When the rate is fixed," said the court (page 230 of 211 U, S., page 71 of 29 Sup. Ct. [53 L. Ed. ——]), "a bill against the commission to restrain the members from enforcing it will not be bad as an attempt to enjoin legislation or as a suit against a state, and will be the proper form of remedy."

In Chicago, B. & Q. Co. v. Winnett (C. C. A.) 162 Fed. 242, the Railway Commission of Nebraska had notified the complainant railroad company to show cause why a proposed schedule of rates should not be adopted. Before a hearing could be had the company brought suit to enjoin the commission from serving the company with any order reducing rates. As the commission had never fixed any rates, the bill had no other object than to perpetually restrain the commission from fixing a rate. It was held that the court had no authority to interfere before the rates were fixed.

It may be added that the Nebraska statute required the commission to fix rates, but provided that notice and opportunity to be heard, and due process to compel the attendance of witnesses, should first be given to the railroad.

In Southern Pac. Co. v. Bd. of R. R. Com'rs (C. C.) 78 Fed. 236, two resolutions adopted by the Railroad Commission of California were attacked. In the first, known as the "Grain Resolution," rates on grain were reduced 8 per cent.; in the second, known as the "Twenty-Five Per Cent. Resolution," it was declared that the general freight rates of the Southern Pacific Company in California were 25 per cent. too high, and that "this board proceed at once to adopt a revised schedule of rates in accordance herewith, in order that the same may be in force before January 1, 1896." The court enjoined enforcement of the first resolution, but declined to interfere with the second,

because the final order declaring a 25 per cent. reduction had not been made.

In the present case it is neither shown by the evidence nor admitted in the pleadings that the Nevada Railroad Commission had instituted investigations and hearings, or determined, and by order fixed, any rate or rates to be observed and followed in future by either or any of the railroads interested in this litigation. This court has no control over the legislative department of the state. It cannot prohibit the Legislature from enacting a statute; it cannot forbid the adoption of rates by the Railroad Commission. After rates have been established, a bill to restrain the commission from enforcing them would be proper.

"Legislative discretion, whether rightfully or wrongfully exercised, is not subject to interference by the judiciary." Alpers v. San Francisco (C. C.) 32 Fed. 503; State R. R. Com. v. People (Colo.) 98 Pac. 7, 12; Glide v. Superior Court, 147 Cal. 21, 81 Pac. 225, 226.

The evidence introduced in behalf of the Nevada & California Railway Company is sufficient to show that the maximum rates, if adopted and enforced during the fiscal year ending June 30, 1907, would have deprived that company of all compensation for the use of its property devoted to intrastate freight traffic. Whatever the actual fact may be, the evidence fails to show with that degree of certainty which is demanded by law that the maximum rates as a whole would operate unjustly if applied to the intrastate freight business of the Southern Pacific Company, the Eureka & Palisade Railway Company, the San Pedro, Los Angeles & Salt Lake Railroad Company, the Tonopah & Goldfield Railroad Company, or the Virginia & Truckee Railway. The testimony also fails to show that the commission by final order fixed any rate or schedule of rates to be observed and followed by the Nevada & California Railway Company, or by any other railway company in Nevada, or has by lawful order adopted as rates to be observed and enforced the statutory maxima.

There are allegations in the pleadings, made on information and belief, to the effect that the commission had adopted the classification set out in section 7 of the act; had demanded of all broad-gauge railroads in the state immediate adoption of the maximum rates, and was and is threatening to institute investigations and hearings and to commence suits unless its demands are acceded to.

The defendants not only fail to deny this, but they admit that if such request had not been complied with, and these suits had not been brought, the commission "would have felt it their duty to advise the Attorney General of Nevada of the failure of complainant to comply as aforesaid." The Attorney General admits "he would, within a reasonable time after receiving such advice, have brought suit to compel complainant to adopt such schedule of rates."

There is nothing here as yet to justify the issuance of an injunction. The legislative or discretionary power of the board has not been fully and finally exercised. Notwithstanding the Attorney General's admission, it is safe to assume that suit will not be brought until some order of the commission establishing rates, made in full and strict compliance with the statute, has been violated. It is also prop-

er to assume that the commission will yield obedience to the Constitution, and that it will not, after due investigation, find and determine a present freight rate unreasonable, when in truth and in fact the rate is both just and reasonable. When an unjust or unreasonable rate or schedule of rates has been actually and finally adopted by order of the board, it may be properly challenged, and its enforcement enjoined.

It is therefore ordered that the bill in each of the suits brought against Bartine et al. be dismissed, and that the injunctions heretofore issued in said suits be dissolved.

The dismissal against the Nevada & California Railway Company is without prejudice.